[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
MARCH 24, 2006
THOMAS K. KAHN
CLERK

_____

No. 04-13114

_____

D. C. Docket No. 02-00586-CR-19-1

UNITED STATES OF AMERICA,

Plaintiff-Appellant,

versus

ELIANY MOLINA,

Defendant-Appellee.

_____

Appeal from the United States District Court
for the Northern District of Georgia

_____

**(March 24, 2006)**

Before CARNES, WILSON and PRYOR, Circuit Judges.

PRYOR, Circuit Judge:

This appeal by the government is from a judgment of acquittal entered in

favor of Eliany Molina after a jury convicted her of knowingly participating in a

drug trafficking conspiracy and possessing a firearm in furtherance of a drug trafficking crime. Because Molina was arrested in her bedroom, which contained drugs and a digital scale, a second digital scale with cocaine residue in an adjoining bathroom, a firearm, the passports of Molina and a brother implicated in drug dealing, a garbage bag in Molina's closet that contained the bulk of the nearly $300,000 seized from her residence, and one drug trafficker besides herself, a reasonable jury could have found that Molina knowingly participated in the drug trafficking conspiracy. Because a firearm was found in the drawer of a nightstand that also contained the passports of both Molina and her brother, a reasonable jury also could have found that Molina possessed a firearm in furtherance of a drug trafficking crime. We reverse and remand.

## I. BACKGROUND

On September 19, 2002, as part of an investigation of a large-scale drug trafficking enterprise, agents of the Drug Enforcement Agency executed a search warrant for 1131 Vermillion Lane, the residence of Carlos Garza, Cesar Garcia, and Eliany Molina. Molina is the sister-in-law of Garza, the common-law wife of Garcia, and the sister of Evarardo Molina, whom investigators had overheard discussing a drug deal with Garza. Agents shouted "DEA" and "police" outside the upstairs bedroom where Molina and Garcia were located, but were not admitted

2

to the room. After "a minute or two," the agents forced open the door and found Garcia holding the bedroom door and Molina standing on the far side of the bed near the adjoining bathroom. Garcia later testified that Molina "didn't have any clothes on" when the officers entered.

The agents discovered substantial evidence of a drug conspiracy. The agents found a digital scale on the top of a dresser, a bag containing 14.3 grams of cocaine on the floor, and a firearm and passports for Molina and her brother inside the open drawer of a nightstand. In an adjoining bathroom, agents found a laundry hamper with a bag containing 25.1 grams of cocaine and a digital scale with cocaine residue, covered by dirty clothes. The agents also discovered two stashes of money: a large garbage bag of bundled U.S. currency in a bedroom closet that Molina shared with Garcia; and, in an adjacent closet "separated by just a thin piece of wood," a shoe box of bundled U.S. currency. The garbage bag contained the bulk of the nearly $300,000 seized from the residence. When questioned upon arrest, Molina stated that Sebastian Cuevas, her brother-in-law and a co-defendant, gave her the shoe box of money and asked her to store it.

On December 16, 2003, a grand jury returned an amended indictment charging fourteen defendants with a variety of drug-related crimes. The indictment alleged three charges against Molina: conspiracy to possess with the intent to

3

distribute, and to distribute, cocaine and methamphetamine, 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A)(ii), (viii), 846; possession with intent to distribute cocaine, 21 U.S.C. §§ 841(a)(1), (b)(1)(C); and possession of a firearm in furtherance of a drug trafficking crime, 18 U.S.C. § 924(c)(1)(A)(i). Molina pleaded not guilty.

At trial, the government presented the testimony of the officers who searched Molina's residence, the evidence seized in that search, and the expert testimony of Special Agent Keith Cromer regarding the operation of Mexican drug trafficking organizations. Cromer testified that drug trafficking organizations often use "stash houses" to store the proceeds of their drug sales and the stash houses frequently are residences occupied by long-time friends or family members of the traffickers. According to Cromer, drug traffickers often possess weapons "for protection from other drug traffickers and from law enforcement. They . . . may have them at the residence where they are going to store the drugs or they store the money." Cromer also testified that drug traffickers use scales to weigh and package drugs for distribution. Another special agent testified that low-level members of a conspiracy are often unidentified until the search warrant is executed.

At the close of the government's case, Molina moved for a judgment of acquittal. Molina argued that the government failed to satisfy its burden of proof

that Molina either entered a drug conspiracy or possessed a firearm in furtherance of drug trafficking. The district court reserved its ruling on the motion.

Molina did not present evidence, but Garcia did. Garcia testified he got the drugs from a man called Marcos, who on a separate occasion asked Garcia to store the garbage bag of money. Garcia testified he stored the garbage bag of money in a bedroom closet that Molina shared with him. Garcia testified the drugs were his, Molina did not know he used drugs, and Molina was unaware of the drugs and the garbage bag of money in the closet. Garcia explained he was "not saying that just because she's my wife, but it will be for me like, you know, as a man accepting what is mine."

As a witness, Garcia was not a model of consistency and plausibility. Garcia testified he did not know the money in the garbage bag was drug money, but later admitted suspicions that the garbage bag contained drug proceeds and Marcos was a drug dealer. Garcia first testified Marcos did not sell him the 38 grams of cocaine, but then explained he planned to pay Marcos approximately $300, or $7.89 per gram. The market price of cocaine in the Atlanta area was between $80 and $100 per gram. Garcia also recounted how he initially told the arresting agents he had no gun, but then told them about the gun in the nightstand. Although Garcia admitted he was concerned someone might try to steal the garbage bag of

5

money Marcos gave him, he denied he would have used the gun to protect the money. Finally, Garcia admitted that, when the DEA agents questioned him upon arrest, he had lied "a little bit."

The jury convicted Molina of conspiracy and possession of a firearm in furtherance of a drug trafficking crime, but acquitted her on the drug possession charge. Molina moved for a post-verdict judgment of acquittal. The district court granted Molina's motion and entered a judgment of acquittal on both charges based on insufficiency of the evidence.

The district court concluded that the only evidence connecting Molina to the conspiracy, "beyond her 'mere presence,'" was Molina's post-arrest statement that Cuevas gave her a shoe box of money and asked her to store it. The district court stated there was no evidence that suggested Molina "was aware of the activities from which that money was derived." The district court also stated there was no evidence that Molina knew of the money in the "blue trash bag hidden in her closet." The district court credited the testimony of Garcia that he had hidden the garbage bag of money by covering it with blankets. "Garcia was," in the words of the district court, "quite emphatic that he had no reason to inform Ms. Molina of the presence of the money." The district court reasoned that Garcia's testimony "negated" Molina's knowledge of the conspiracy and the government "presented

no evidence to contradict Mr. Garcia's testimony."

The district court also concluded "there is no nexus between Ms. Molina, the firearm, and any drug trafficking crime which was taking place at the moment law enforcement apparently awakened her in her bedroom that morning." The district court stated there was no evidence "that Ms. Molina had ever been seen with a gun or even heard mentioning a gun during the entirety of the very extensive investigation which resulted in this charge." The district court also explained, "Mr. Garcia testified that the gun was his."

## II. STANDARD OF REVIEW

"In considering a motion for the entry of a judgment of acquittal, a district court 'must view the evidence in the light most favorable to the government, and determine whether a reasonable jury could have found the defendant guilty beyond a reasonable doubt.'" United States v. Miranda, 425 F.3d 953, 959 (11th Cir. 2005) (quoting United States v. Sellers, 871 F.2d 1019, 1021 (11th Cir. 1989)). "The prosecution need not rebut all reasonable hypotheses other than guilt. The jury is free to choose between or among the reasonable conclusions to be drawn from the evidence presented at trial, and the court must accept all reasonable inferences and credibility determinations made by the jury." Sellers, 871 F.2d at 1021 (internal quotations and citations omitted). "The district court's

7

determination that the evidence introduced at trial was insufficient to support the jury's verdict of guilt is an issue of law entitled to no deference on appeal." Id.

### III. DISCUSSION

The government argues the district court erroneously entered a judgment of acquittal for each of Molina's two convictions. We review the sufficiency of the evidence and conclude it was reasonable for the jury to convict on each charge. We consider the charge of conspiracy first, followed by the charge of possession of a firearm in furtherance of a drug trafficking crime.

*A. Sufficient Evidence Supported Molina's Conviction for Conspiracy.*

"To sustain a conviction for conspiracy to possess cocaine with intent to distribute, the government must prove beyond a reasonable doubt (1) that a conspiracy existed; (2) that the defendant knew of it; and (3) that the defendant, with knowledge, voluntarily joined it." United States v. Lopez-Ramirez, 68 F.3d 438, 440 (11th Cir. 1995). "The very nature of conspiracy frequently requires that the existence of an agreement be proved by inferences from the conduct of the alleged participants or from circumstantial evidence of a scheme." United States v. Ayala, 643 F.2d 244, 248 (5th Cir. Unit A 1981). "A conspiracy conviction will be upheld . . . when the circumstances surrounding a person's presence at the scene of conspiratorial activity are so obvious that knowledge of its character can fairly be

8

attributed to him." United States v. Figueroa, 720 F.2d 1239, 1246 (11th Cir. 1983).

Although "[m]ere presence is insufficient to establish knowing participation in a conspiracy," United States v. Villegas, 911 F.2d 623, 629 (11th Cir. 1990), this appeal is not about mere presence. Agents discovered, in Molina's closet, a garbage bag that contained the bulk of the nearly $300,000 seized from Molina's residence. Because "[a] person who owns or exercises dominion and control over a . . . residence in which contraband is concealed may be deemed to be in constructive possession of the contraband," United States v. Vera, 701 F.2d 1349, 1357 (11th Cir. 1983), the large quantity of money in Molina's closet was a basis for the jury reasonably to infer Molina's knowing participation in the conspiracy. See United States v. High, 117 F.3d 464, 469 (11th Cir. 1997) (stating "a defendant involved only in the money laundering facet of the drug business could be considered a part of the conspiracy to distribute those drugs" (citing United States v. Bollinger, 796 F.2d 1394, 1407-08 (11th Cir. 1986))). The government also presented evidence of the drugs and digital scale in plain view in Molina's bedroom, the drugs and digital scale with cocaine residue hidden in the bathroom hamper, the firearm and the passports of Molina and her brother in the open drawer of the nightstand, and Molina's statement that a family member and co-conspirator

9

asked her to store the shoe box of bundled U.S. currency. Because the record shows that Molina did not clothe herself in the "minute or two" that DEA agents attempted to enter her room, a reasonable jury also could have inferred that Molina used that time to hide the drugs and scale with cocaine residue in the bathroom hamper while Garcia held the bedroom door. Taken together, this evidence was more than sufficient to prove Molina's knowledge of and participation in the conspiracy.

Although Garcia testified that Molina had no knowledge of either the drugs or the bag of money in the closet, the jury was free to discredit his testimony. See United States v. Brown, 53 F.3d 312, 316 (11th Cir. 1995) ("All questions of credibility are for the jury."). Drug dealers have been known to lie, and it is not unprecedented for a man to try to protect his wife. The district court erred when it credited Garcia's testimony because the district court was obliged to view the evidence in the light most favorable to the government. See Miranda, 425 F.3d at 959; Sellers, 871 F.2d at 1021. Because sufficient evidence supported Molina's conviction for conspiracy, the district court erred in entering a judgment of acquittal on that charge.

*B. Sufficient Evidence Supported Molina's Conviction for Possession of a Firearm in Furtherance of a Drug Trafficking Crime.*

Federal law is violated when "any person who, during and in relation to any

crime of violence or drug trafficking crime . . . uses or carries a firearm, or who, in furtherance of any such crime, possesses a firearm." 18 U.S.C. § 924(c)(1)(A). "Possession may be either actual or constructive." United States v. Sweeting, 933 F.2d 962, 965 (11th Cir. 1991). To establish constructive possession, the government must prove "ownership, dominion, or control" over the firearm. United States v. Ferg, 504 F.2d 914, 916 (5th Cir. 1974). To establish that a firearm was possessed "in furtherance" of a drug trafficking crime, the government must show "'some nexus between the firearm and the drug selling operation.'" United States v. Timmons, 283 F.3d 1246, 1253 (11th Cir. 2002) (quoting United States v. Finley, 245 F.3d 199, 203 (2d Cir. 2001)). "The nexus between the gun and the drug operation can be established by '. . . accessibility of the firearm, . . . proximity to the drugs or drug profits, and the time and circumstances under which the gun is found.'" Id. (quoting United States v. Ceballos-Torres, 218 F.3d 409, 414-15 (5th Cir. 2000)).

Because the firearm was found in Molina's bedroom, in the drawer of the nightstand that also contained both her passport and the passport of her brother, a reasonable jury could have found that Molina exerted "ownership, dominion, or control" over the firearm. The accessibility of the firearm in the open drawer of the nightstand and the proximity of the firearm to the drugs, digital scales, and

11

large amount of money in the bedroom closets together established a sufficient nexus between the firearm and the drug trafficking crime. The government presented evidence that drug traffickers often use firearms to protect drugs and drug proceeds from other drug traffickers and from law enforcement, and the jury was free to discredit entirely Garcia's testimony that the firearm belonged to him. The district court erroneously credited Garcia's testimony and failed to view the evidence in the light most favorable to the government. The district court erred in entering a judgment of acquittal on this charge.

## IV. CONCLUSION

The evidence at trial was sufficient for a jury to convict Molina of participating in the drug trafficking conspiracy and possessing a firearm in furtherance of a drug trafficking crime. The judgment of acquittal in favor of Molina on both charges is reversed, and Molina's convictions are reinstated. This case is remanded for further proceedings.

**REVERSED and REMANDED.**