[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 12-12513

_____

D.C. Docket No. 9:11-cr-80165-KLR-1

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

ANES JOSEPH,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

(September 23, 2013)

Before HULL and MARTIN, Circuit Judges, and BOWEN,[*] District Judge.

HULL, Circuit Judge:

_____

[*]Honorable Dudley H. Bowen, Jr., United States District Judge for the Southern District
of Georgia, sitting by designation.

After a jury trial, Anes Joseph appeals his convictions on five counts related to the illegal purchase and shipment of firearms to Haiti. Joseph also challenges his total 63-month sentence. On appeal, Joseph argues that (1) the government presented insufficient evidence to convict him on any of the five counts in the indictment; (2) the district court erroneously admitted certain evidence at trial, in violation of Federal Rule of Evidence 403 and the Confrontation Clause; (3) the district court erred in calculating his Sentencing Guidelines range by denying him a two-level reduction under U.S.S.G. § 3B1.2(b) for his minor role in the offense, and a two-level reduction under U.S.S.G. § 3E1.1(a) for acceptance of responsibility; and (4) his 63-month total sentence was unreasonable.

After oral argument, review of the record, and consideration of the parties' briefs, we affirm Defendant Joseph's convictions and sentences on Counts 1, 2, 4, and 5. We vacate his conviction and sentence on Count 3, and remand to the district court for the reasons discussed herein.

## I.    INDICTMENT

In January 2012, a federal grand jury issued a five-count superseding indictment ("the indictment") against Defendant Joseph. Count 1 charged Joseph with a conspiracy, under 18 U.S.C. § 371, to commit four substantive offenses: (1) shipping a firearm without notice to the carrier, in violation of 18 U.S.C. §§ 922(e) and 924(a)(1)(D); (2) transferring a firearm to an out-of-state resident, in violation

of 18 U.S.C. § 922(a)(5); (3) making a false written statement in connection with a purchase of a firearm, in violation of 18 U.S.C. § 922(a)(6); and (4) illegally exporting firearms to Haiti, in violation of 18 U.S.C. § 554(a).  Counts 2, 3, 4, and 5 charged Joseph with the above four substantive offenses, respectively.  Count 3, however, charged Joseph only with attempting to transfer a firearm to an out-of-state resident, rather than actually transferring such firearm.  Likewise, Count 5 charged Joseph with attempting to illegally export firearms.

## II.    TRIAL EVIDENCE

### A.    Discovery of Firearms Inside a Dump Truck

On August 26, 2011, Agent Bryan Mattina from the Department of Homeland Security ("DHS") was called to inspect a 1988 Mack dump truck that was located at the Port of Palm Beach, Florida, waiting to be shipped to Haiti. The dump truck was "quite beat up" and "very rusty," and  "some parts did not work," but Agent Mattina and other officers were able to start the truck and move it to another location for inspection.  The truck was loaded with a variety of items, such as "multiple mattresses, tires, furniture and a lot of shelving units."  This cargo was in a dilapidated condition— "very dirty, beat up," and with a "musty, moldy odor."

Inside the dump truck, near the tailgate, officers found several blue barrels. Officers put the barrels through an x-ray machine, but they were unable to obtain a

3

solid image of the contents because the barrels were densely packed and filled with liquid.  Officers then physically examined the barrels and found "toiletries, shower gels, shampoos, and a lot of rainwater and other liquid spilled inside."

Buried inside the first barrel, officers found a clear plastic bag containing three gun cases.  Each of the three gun cases was made for a Glock handgun and contained that gun's serial number, but did not include the actual handgun.

The second blue barrel was packed similarly to the first, and contained toiletries, some clothing, and a big brown comforter or blanket.  Wrapped inside the brown blanket, officers found five "Glock 17" firearms and multiple rounds of ammunition, along with magazines and "speed loaders" used to assist the loading of the magazines.  In addition to the firearms and ammunition, the second blue barrel contained three more Glock cases inside a "Lou's Police Supply" bag.

 A further search of the dump truck also revealed a white barrel.  Inside this white barrel, beneath a "very dirty and soiled blanket," officers found another "Lou's Police Supply" bag containing three more Glock gun cases.  Officers also found a manila envelope addressed to Kempest Lauricin in Boynton Beach, Florida, and a "Bulldog Vault" gun safe.  Inside the gun safe, officers found seven firearms: two Glock 17 pistols, two Glock 26 pistols, two Intratec 9 millimeter pistols, and one loaded Beretta pistol.  The safe also contained several magazines,

a gun holster, and ammunition.  Altogether, the barrels inside the dump truck held 12 firearms, 9 of which were Glock pistols.

The shipping documents for the dump truck, which included a dock receipt and a contents list, named Defendant Joseph as both the shipper and receiver/consignee of the truck.  This meant that Defendant Joseph was the one who dropped off the truck for shipment to Haiti and the one who would pick up the truck once it arrived at the Haitian port.  The title of the dump truck listed Defendant Joseph as the owner.  Neither the contents list nor any other shipping document for the dump truck referenced any firearms.  Moreover, a records check revealed that neither Defendant Joseph nor Kempest Lauricin had licenses to export firearms.

DHS Agent Anderson Sullivan further investigated the firearms discovered in the dump truck.  Agent Sullivan learned that the nine Glock firearms were purchased within the last two months.  Three of those Glock firearms were purchased by Defendant Joseph, and the other six were bought by Joseph's brother, Keslin Joseph ("Keslin").

**B.    Defendant Joseph's and Keslin's Purchase of the Firearms**

On July 23, 2011, approximately one month before officers found the firearms in the dump truck, Defendant Joseph purchased three Glock 17 pistols

from Lou's Police Supply.  These three guns were among the firearms found in the second blue barrel on the dump truck.

To buy a firearm from Lou's Police Supply, Defendant Joseph had to complete Form 4473 issued by the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF").  Question 11A on Form 4473 asked: "Are you the actual transferee/buyer of the firearms listed on this form?"  Next to this question was the following warning:  "You are not the actual buyer if you are acquiring the firearm on behalf of another person.  If you are not the actual buyer, the dealer cannot transfer the firearm to you."  Joseph answered "yes" to question 11A on Form 4473 when he bought the three Glock firearms on July 23, 2011, thereby indicating that he intended to buy the firearms only for himself.

On August 6, 2011, Joseph's brother Keslin bought six firearms: four Glock 17s and two Glock 26s.  Based on the serial numbers, these six weapons were among those found in the second blue barrel and the white barrel on the dump truck.  In purchasing the six firearms, Keslin filled out Form 4473 and answered "yes" to question 11A, which asked whether he was "the actual transferee/buyer of the firearms."

Kempest Lauricin (Defendant Joseph's cousin) was with Keslin at Lou's Police Supply on August 6, 2011.  While there, Lauricin bought the Bulldog Vault gun safe that was later found on the dump truck.

6

When Keslin left the gun shop after buying the six Glocks, the salesman saw him leaving in a red Chevrolet Avalanche truck. Officers learned that this Chevy Avalanche truck belonged to Defendant Joseph. As it turned out, Keslin and Lauricin borrowed the Chevy Avalanche from Joseph and used it to purchase the guns and safe from Lou's Police Supply on August 6. Joseph was not with them that day.

## C.    Loading of the Dump Truck

Although Joseph was listed as the owner on the title of the dump truck where the guns were found, evidence showed that the truck actually belonged to Keslin, who had purchased the truck on May 9, 2011. Joseph agreed to have his name put on the title to assist his brother.

In August 2011, Keslin took the dump truck to a tire shop and bought seven tires for the truck. Keslin obtained permission from the tire shop owner to leave the truck at the shop for several days so the truck could be loaded. The tire shop owner observed Defendant Joseph, Keslin, and their cousin Lauricin come and load the dump truck while the truck was parked at the shop. The dump truck stayed at the tire shop for more than a week until it was filled "to the top."

## D.    Joseph's Post-Arrest Interview

On September 12, 2011, Agent Sullivan arrested Defendant Joseph at the Miami airport as he was about to board a flight to Haiti. Joseph waived his

Miranda[1] rights and agreed to talk. During the interview, Joseph admitted to Agent Sullivan that he bought the three Glock 17s on July 23, 2011, one day after being terminated from his job as a security officer. After the purchase, Joseph wrapped the three Glocks in white paper towels and plastic wrap, placed the three Glock cases in a separate bag, and instructed Keslin to put the firearms and the cases "in the truck."

Defendant Joseph did not explicitly tell Keslin that the wrapped packages contained firearms, although one could see that the cases were for firearms. Joseph also did not tell Keslin where on the truck to put the wrapped packages. Joseph admitted during the interview that he loaded some items onto the truck, such as couches, but he denied putting anything into the barrels.

Defendant Joseph took the dump truck to the port for shipment on August 19, 2011, less than a month after purchasing the firearms. Joseph stated that it cost $2,400 to ship the dump truck. Joseph paid $1,700 of that sum, which he obtained from his brother Keslin. Subsequently, Lauricin paid the rest of the money. Joseph stated that he did not fill out the shipping documents, and, indeed, Agent Sullivan's investigation showed that Joseph's signatures on several of the shipping documents may have been forged by Lauricin.

---

[1]Miranda v. Arizona, 384 U.S. 436, 86 S. Ct. 1602 (1966).

8

However, Joseph <u>admitted</u> that he knew his name was used in shipping the truck. In fact, when Joseph was arrested on September 12, the shipping documents for the truck, including the contents list and the truck title, were found in his carry-on luggage. Joseph told Agent Sullivan that, upon the dump truck's arrival in Haiti, his cousin Jackson, who was a police officer there, would have helped get the truck out of the port.

Joseph also told Agent Sullivan that he was sending the three guns to his cousins in Haiti. However, Joseph denied that he bought the firearms for anyone other than himself. Specifically, when Agent Sullivan asked Joseph whether he (Joseph) knew at the time of purchase that the guns would be sent to his cousins in Haiti, Joseph answered: "no, I bought those for myself."

After the post-arrest interview, in a recorded phone call to his wife, Joseph also stated he bought the guns for himself, not anyone else, and shipped the guns simply because he no longer needed them. Agent Sullivan testified that Joseph and his wife knew that this conversation was being recorded.

## E.    Evidence of Earlier Gun Trafficking

Trial testimony suggested that Defendant Joseph, his brother Keslin, and their cousin Lauricin may have shipped guns to Haiti on previous occasions. Specifically, in February 2011, Lauricin purchased two Taurus .40 caliber pistols at a gun show (those pistols were not among the 12 found on the dump truck).

9

Lauricin picked up those guns from Ed's Munitions gun shop on February 21, 2011. Also on February 21, 2011, Keslin purchased seven Glock 19 pistols from Lou's Police Supply. On March 9, 2011, Keslin purchased five more Glock pistols from Lou's Police Supply: one Glock 17 and four Glock 19s.

Several days earlier, on March 5, 2011, Defendant Joseph purchased two Glock 17 pistols, also from Lou's Police Supply. At the September 12 post-arrest interview, Joseph told Agent Sullivan that those two guns were stolen from his vehicle while it was parked at his house. Joseph stated that he contacted the local police department about the alleged theft, but no police officer came to take a statement or file a complaint on Joseph's behalf. Agent Sullivan was unable to locate any police report with regard to that incident.

On April 22, 2011, Lauricin took a flight from Miami to Port-au-Prince, Haiti. Several days later, on April 26, 2011, Lauricin shipped a 1994 four-door Toyota Land Cruiser to Haiti out of the Port of Palm Beach. At the September 12 interview, Defendant Joseph told Agent Sullivan that Lauricin "used to send car[s] all the time, that's why he didn't let me even get close to [the shipping documents] because he probably knows he ha[s] stuff in there."

## F.    Expert Testimony

A government expert on firearm trafficking testified that a Glock firearm could be sold for approximately $1,500 in Haiti, about three times its retail value in

10

the United States.  The expert also testified that (1) a vast majority of guns ("probably 80 percent") illegally smuggled out of the United States are Glocks; and (2) people would rarely buy multiple Glocks of the same model for their own use.

At the end of the government's evidence, Joseph moved for acquittal on all five counts, pursuant to Federal Rule of Criminal Procedure 29.  The district court denied the motion.  The defense rested without presenting any evidence.

## III.  COUNT 3

Before oral argument, the government filed a "confession of error," asking us to vacate Joseph's conviction on Count 3 of the indictment because that count failed to allege the federal § 922(a)(5) offense of transferring a firearm to an out-of-state resident, but instead alleged only an "attempt" to conduct such a transfer.

We agree with the parties that Count 3 of Joseph's indictment failed to allege an offense.  Count 3 charged Defendant Joseph with an "attempt to transfer" firearms to an out-of-state resident, in violation of § 922(a)(5).  However, § 922(a)(5) only makes it illegal "to transfer, sell, trade, give, transport, or deliver any firearm" to an out-of-state resident.  18 U.S.C. § 922(a)(5).[2]  The statute does

---

[2]Specifically, to prove a violation of § 922(a)(5), the government must establish the following four elements:

(1) the defendant was not a licensed firearms importer, manufacturer, dealer, or collector; (2) the defendant transferred, sold, traded, gave, transported, or delivered a firearm to another person; (3) the person to whom the defendant

11

not prohibit <u>an attempt</u> to do so.  <u>See</u> <u>id.</u>; <u>United States v. Tyson</u>, 653 F.3d 192, 204 n.16 (3d Cir. 2011) ("By its terms, § 922(a)(5) does not criminalize the attempt to transfer a firearm to an out-of-state resident.").[3]  And Joseph's indictment does not rely on any general attempt statute, or any other statute that prohibits an attempt to violate § 922(a)(5).  Therefore, because both parties agree and have actually shown that Count 3 of the indictment failed to allege an offense, we vacate Joseph's conviction on Count 3.

## IV.    SUFFICIENCY OF THE EVIDENCE

Defendant Joseph argues that the government presented insufficient evidence to convict him on all four remaining counts of the indictment.[4]  We discuss each count in turn.

### A.    Count 1: Conspiracy

---

transferred the firearm was not a licensed importer, manufacturer, dealer, or collector; and (4) the defendant knew or had reasonable cause to believe that the person to whom the firearm was transferred did not reside in the defendant's state of residence.

<u>United States v. Fries</u>, __ F.3d __, 2013 WL 3991917 (11th Cir. 2013) (emphasis added).

[3]In contrast, the statute prohibiting exportation of firearms, as charged in Count 5 of Joseph's indictment, also expressly prohibits the attempt to commit the crime.  <u>See</u> 18 U.S.C. § 554(a).

[4]We review <u>de novo</u> the sufficiency of the evidence to support a criminal conviction. <u>United States v. Frazier,</u> 605 F.3d 1271, 1278 (11th Cir. 2010).  In making this determination, we view the evidence "in the light most favorable to the government, with all reasonable inferences and credibility choices made in the government's favor." <u>Id.</u> (internal quotation marks omitted).

12

Count 1 charged Joseph with conspiring to commit four substantive firearm offenses, in violation of 18 U.S.C. § 371 (the general conspiracy statute).[5] To prove a conspiracy under 18 U.S.C. § 371, the government must show the following: "(1) agreement between two or more persons to achieve an unlawful objective; (2) knowing and voluntary participation in that agreement by the defendant; and (3) an overt act in furtherance of the agreement." United States v. Broughton, 689 F.3d 1260, 1277 (11th Cir. 2012). "The very nature of conspiracy frequently requires that the existence of an agreement be proved by inferences from the conduct of the alleged participants or from circumstantial evidence of a scheme." United States v. Molina, 443 F.3d 824, 828 (11th Cir. 2006) (internal quotation marks omitted).

A defendant may be convicted of conspiracy "even if his or her participation in the scheme is 'slight' by comparison to the actions of other co-conspirators."

---

[5]Where, as here, the indictment alleges a conspiracy to commit multiple offenses, we will uphold the conviction if the evidence sufficiently shows a conspiracy to commit at least one of those offenses, as long as the jury unanimously agrees on which offense that was. See United States v. Vernon, 723 F.3d 1234, 1263-64 (11th Cir. 2013). Joseph does not argue that the jury failed to agree unanimously on which of the four substantive firearm offenses, if not all, he conspired to commit.

We also note that the jury could have convicted Joseph of conspiring to commit the § 922(a)(5) offense of transferring a firearm to an out-of-state resident, even though Joseph never actually completed the transfer required for the commission of the substantive offense. See United States v. Chandler, 388 F.3d 796, 805-06 (11th Cir. 2004) ("The essence of the conspiracy is this agreement to commit an unlawful act. What distinguishes the offense of conspiracy from a substantive offense, is that agreement is the essential evil at which the crime of conspiracy is directed. The agreement itself remains the essential element of the crime." (internal quotation marks and citations omitted)).

United States v. Vernon, 723 F.3d 1234, 1273 (11th Cir. 2013) (internal quotation marks omitted).  However, mere presence at the scene of conspiratorial activity "is insufficient to establish knowing participation in a conspiracy."  Molina, 443 F.3d at 828-29 (internal quotation marks omitted).

On appeal, Defendant Joseph does not challenge the fact that a gun-smuggling conspiracy existed, as charged in the indictment.  Rather, Joseph contests only the second element of a conspiracy, arguing that he did not knowingly and voluntarily join in the gun smuggling activities of his brother Keslin and his cousin Lauricin.  Joseph contends that the evidence at most showed him "merely being present" at the scene of the crime.  This argument fails.

The government introduced ample circumstantial evidence at trial to show that Defendant Joseph knew about, and voluntarily participated in, the gun-smuggling activities of Keslin and Lauricin.  Viewed in the light most favorable to the government, the evidence showed that Joseph cooperated with Keslin in the purchase, loading, and shipment of the dump truck where the guns were found.  Specifically, although Keslin purchased the truck, Joseph admitted that he allowed his name to be used on the title of the truck.   Joseph also helped Keslin and Lauricin load the truck at the tire shop, and gave Keslin three Glock firearms, along with their cases, to put on the truck.  Furthermore, although Keslin and Lauricin paid the costs of shipping the truck, and while Lauricin may have filled

14

out the shipping forms, Joseph (1) allowed his name to be used on the shipping forms, (2) agreed to act as the shipper and consignee of the truck, and (3) took the truck to the port for shipping.  In fact, when Joseph was arrested at the airport on September 12, on his way to Haiti, the shipping documents for the truck were found in his carry-on luggage.

From all of this evidence, a reasonable jury could infer that Joseph knew about, and voluntarily joined, the conspiracy to smuggle guns to Haiti.

**B.    Count 2: Unlawful Shipment of Firearms**

Count 2 charged Joseph with shipping a firearm without notice, in violation of 18 U.S.C. §§ 922(e) and 924(a)(1)(D).  Section 922(e) makes it illegal for a person (1) "knowingly to deliver or cause to be delivered" (2) "any package or other container in which there is any firearm or ammunition" (3) "to any common or contract carrier for transportation or shipment in interstate or foreign commerce," (4) "to persons other than licensed importers, licensed manufacturers, licensed dealers, or licensed collectors," (5) "without written notice to the carrier that such firearm or ammunition is being transported or shipped."  18 U.S.C. § 922(e).  Section 924(a)(1)(D) provides, in turn, that whoever "willfully violates" § 922(e) is subject to a five-year statutory maximum sentence.  See 18 U.S.C. § 924(a)(1)(D).

Defendant Joseph argues that the government failed to show the element of willfulness.  "[T]o establish a 'willful' violation of a statute, the Government must prove that the defendant acted with knowledge that his conduct was unlawful." Bryan v. United States, 524 U.S. 184, 191-92, 118 S. Ct. 1939, 1945 (1998) (internal quotation marks omitted).  The government need not show, however, that the defendant was aware of the particular statute he was violating.  Id. at 196, 118 S. Ct. at 1947 ("[T]he willfulness requirement of § 924(a)(1)(D) does not carve out an exception to the traditional rule that ignorance of the law is no excuse; knowledge that the conduct is unlawful is all that is required.").

Here, the government introduced sufficient evidence to show that Joseph knew his conduct in shipping the firearms without notice was unlawful.  The evidence showed that, when Joseph took the dump truck to the port for shipment to Haiti, he knew that firearms were concealed on the truck.  After all, he wrapped his three Glocks in paper towels and plastic wrap and gave them to Keslin to put on the truck.  Joseph also knew that the shipping documents for the dump truck, including the contents list, did not reference any firearms.  Because Joseph, Keslin, and Lauricin obviously tried to conceal their shipment of firearms, a reasonable jury could conclude that Joseph knew his actions in shipping the guns were unlawful, even if he did not know which particular law he was violating.  See United States v. Starks, 157 F.3d 833, 839 n.8 (11th Cir. 1998) (stating that

16

evidence of the defendants' furtive activity raised an inference of willfulness, even if the defendants "may not have known that they were specifically violating" the statute of conviction).

## C.    Count 4: Making a False Statement in Relation to Firearms Purchase

Count 4 charged Joseph with making a false written statement in connection with a purchase of a firearm, in violation of 18 U.S.C. § 922(a)(6).  A person is guilty of violating § 922(a)(6) if (1) he knowingly makes a false statement (2) in connection with the acquisition of a firearm or ammunition from a licensed importer, manufacturer, dealer, or collector; (3) the false statement was intended or likely to deceive such importer, manufacturer, dealer, or collector; (4) and the statement was material to the lawfulness of the sale of such firearm or ammunition. 18 U.S.C. § 922(a)(6).

Joseph argues that he never provided a false statement to the firearms dealer and never intended to deceive the dealer.  However, undisputed trial evidence showed that, when Joseph purchased the three Glock 17s on July 23, 2011, he stated on ATF Form 4473 that he was buying those guns for himself.  This was a false statement because, as discussed above, Joseph did not actually intend to buy those three guns for himself, but rather for his cousins in Haiti.

We recognize that Joseph could have formed the intent to transfer the firearms only after the purchase, but circumstantial evidence shows otherwise.

17

Specifically, (1) Joseph bought the three Glock 17s on July 23, 2011, after he was fired from his job as a security officer; (2) the three guns he bought were identical Glock 17 firearms that had no collectible value; (3) Joseph had already purchased two Glock 17s in March 2011, and, although he later claimed those two guns were stolen, the jury was not required to believe this claim; and (4) Keslin bought several of the same type of firearms for shipment to Haiti.  Certainly, a reasonable jury could infer from this evidence that Joseph did not intend to buy the firearms for himself when he filled out Form 4473 on July 23, 2011.  See United States v. Henry, 920 F.2d 875, 877 (11th Cir. 1991) (stating that circumstantial evidence may support a finding of guilt "even if the jury might draw other reasonable inferences from the circumstantial evidence" (internal quotation marks omitted)).

**D.    Count 5: Illegal Exporting of Firearms**

Count 5 charged Joseph with illegally attempting to export firearms to Haiti, in violation of 18 U.S.C. § 554(a).  A person violates § 554(a) if he (1) fraudulently or knowingly (2) exports "or attempts to export" any merchandise, article, or object (3) in violation of any law or regulation of the United States.  18 U.S.C. § 554(a) (emphasis added).

Joseph argues that there was insufficient evidence to show that he participated in attempting to export firearms to Haiti.  However, as thoroughly discussed above, there was ample circumstantial evidence showing that Joseph

18

was, in fact, knowingly involved in shipping the firearms to Haiti on the dump truck. We need not repeat this evidence here.

In sum, the government introduced sufficient evidence at trial to support Defendant Joseph's convictions on Counts 1, 2, 4, and 5 of the indictment.[6]

## V.  EVIDENTIARY ISSUES

### A.    Testimony of Agent Sullivan

Defendant Joseph broadly challenges as "confusing and prejudicial" (1) several opinion statements, made by Agent Sullivan during the September 12 post-arrest interview with Joseph, that touched on Joseph's credibility; and (2) Agent Sullivan's testimony interpreting Joseph's statements.[7] We first lay out the relevant facts.

At trial, the government played a number of audio clips of the September 12 post-arrest interview. In one of those audio clips, Agent Sullivan told Joseph: "I

---

[6]In addition to challenging the sufficiency of the evidence, Joseph argues separately in his brief that the district court erred in denying his Rule 29 motion for acquittal. Our review of the district court's denial of a Rule 29 motion for acquittal "is comparable to the standard used in reviewing the sufficiency of the evidence to sustain a conviction." See United States v. Ellington, 348 F.3d 984, 989 (11th Cir. 2003). For the reasons stated above, the evidence was sufficient to convict Joseph on all five counts, and, therefore, the district court did not err in denying his Rule 29 motion.

[7]Ordinarily, we review the district court's evidentiary rulings for abuse of discretion. United States v. Brown, 665 F.3d 1239, 1247 (11th Cir. 2011). Joseph concedes, however, that he failed to object to at least some of the statements he now challenges. We review those unobjected-to statements only for plain error, which requires the defendant to show (1) an error (2) that was plain, (3) that affected the defendant's substantial rights, and (4) that "seriously affected the fairness, integrity, or public reputation of the district court proceedings." Id. at 1247 & n.3. We need not explain in detail, however, which particular statements warrant only plain-error review, as we find no reversible error even under the lighter, abuse-of-discretion standard.

don't believe you, . . . about the guns in the car. . . . The two [guns] stolen in the car." Agent Sullivan was referring to the two Glock 17s that Joseph purchased in March 2011, and that Joseph claimed were stolen from his car.

In another audio clip of the September 12 interview, Agent Sullivan questioned the credibility of Joseph's explanation regarding the shipment of his three Glocks to Haiti, stating:

> Unfortunately, everything that—about the way that [t]his happened from a cop—a couple of cops' standpoint, not just us either, is that everything was done to try to conceal the fact that you were sending the guns. And that that's really the issue, because there are legal ways to do it. But instead of finding the legal way, it looks like you and your brother got together and said, Let's—we'll just hide them in the truck amongst all this other stuff.

During Agent Sullivan's direct examination, the government inquired whether Agent Sullivan had asked Joseph why he did not send the three guns to Haiti "in a safer way." In response, Agent Sullivan testified that, although he did ask Joseph this question,

> I'm still not certain what he [Joseph] told me. There was a handful of different statements that came from the defendant at that time; something along the lines of, if he knew a safer way, he would send it—he would send it, he didn't care what the price was. And then it manifested a little bit further into talking about his brother's firearms purchases as well. And I really wasn't certain what he was trying to tell me.

In addition to the recorded post-arrest interview, the government introduced audio clips of recorded phone conversations between Joseph and his wife. In one

20

of the audio clips, Joseph purportedly spoke to his wife about Lauricin's gun-

smuggling activities, stating:

> You watch because I'm not going to take nothing for nobody, and
> whatever I did I did. (Inaudible) Kempest used to send car[s] all the
> time, that's why he didn't let me even get close to that paper because
> he probably knows he have stuff in there.  I have nothing to do to
> anybody stuff.

The government asked Agent Sullivan what Joseph was saying in this clip, and

Sullivan testified:

> The defendant's speaking about the fact that his cousin, Kempest,
> used to send cars all the time—or on a more frequent basis, I guess.
> And then his cousin, Kempest, didn't let him get close to that paper,
> meaning the shipping documents and title, and saying that Kempest
> probably had stuff on the vehicle, <u>what I interpreted to mean  "guns"
> on the vehicle also</u>.

(Emphasis added).

Before trial, Defendant Joseph filed a motion in limine seeking to exclude

some of Agent Sullivan's opinion statements made during the September 12 post-

arrest interview.  The district court denied the motion on the first day of trial, but

stated that it would "instruct the jury that what the officers say is not evidence, and

that they have a point of view which doesn't concern the jury."

During trial, when the government formally introduced all of its audio clips

into evidence, Defendant Joseph reiterated his objection to Agent Sullivan's

opinion statements.  The district court overruled the objection, but instructed the

jury as follows:

21

Members of the jury, you recall at the beginning of the case I said what the lawyers say isn't evidence.  Evidence comes from the witness stand and exhibits.  I would add to that when you read these [transcripts of the recorded conversations], <u>you've got agents who are interviewing the parties.  What the agents say in their questioning isn't evidence either.  They may comment or make statements that they would like the Defendant to agree to, but that's not evidence unless the parties agree to it.</u>

Just that one caution.  <u>Don't take the statements of the agent as evidence.</u>

(Emphasis added).

On appeal, Defendant Joseph argues that the opinion statements and testimony by Agent Sullivan were inadmissible under Federal Rule of Evidence 403 because their prejudicial effect outweighed their probative value.  Joseph contends that Agent Sullivan's status as a government agent led the jury to give his statements undue weight and to consider his opinions as evidence of the truth.

Under Rule 403, a district court "may exclude relevant evidence if its probative value is substantially outweighed by a danger of . . . unfair prejudice." Fed. R. Evid. 403; <u>United States v. Nelson</u>, 712 F.3d 498, 512 (11th Cir. 2013). Rule 403, however, "is an extraordinary remedy which the district court should invoke sparingly."  <u>United States v. Elkins</u>, 885 F.2d 775, 784 (11th Cir. 1989). The balance under Rule 403 "should be struck in favor of admissibility," and we will "look at the evidence in a light most favorable to its admission, maximizing its probative value and minimizing its undue prejudicial impact."  <u>Id.</u>

22

Furthermore, we will not reverse evidentiary rulings, even if erroneous, unless the errors affected a defendant's substantial rights: that is, unless the errors had a "substantial influence on the outcome of a case or leave grave doubt as to whether they affected the outcome of a case." United States v. Frazier, 387 F.3d 1244, 1266 n.20 (11th Cir. 2004) (en banc) (internal quotation marks omitted); see also 28 U.S.C. § 2111 ("On the hearing of any appeal . . . in any case, the court shall give judgment after an examination of the record without regard to errors or defects which do not affect the substantial rights of the parties.").

Here, Agent Sullivan's statements had probative value because they helped place in context Joseph's explanations regarding his purchase of firearms and his involvement in shipping firearms to Haiti. And the danger of unfair prejudice was minimal because the district court made clear to the jury, before the audio-clips were played, that the interviewing agents' statements were not to be taken as evidence. See United States v. Lopez, 649 F.3d 1222, 1237 (11th Cir. 2011) ("We presume that juries follow the instructions given to them."); see also United States v. Ramirez, 426 F.3d 1344, 1354 (11th Cir. 2005) (stating that the risk of undue prejudice from the admission of certain evidence "was reduced by the court's limiting instruction"). Thus, we cannot say the district court abused its discretion in admitting Agent Sullivan's statements.

23

Furthermore, even without the challenged statements by Agent Sullivan, the record contained ample independent evidence of Joseph's guilt, as described above. Accordingly, any alleged error in admitting Agent Sullivan's statements was harmless. See United States v. Newsome, 475 F.3d 1221, 1227 (11th Cir. 2007) ("[W]hen the record contains sufficient independent evidence of guilt, any error was harmless.").

**B.    Confrontation Clause**

Defendant Joseph next argues that his rights under the Confrontation Clause were violated when the district court admitted into evidence a text message from an individual named Angelo.

At trial, Agent David Malone of the DHS testified about the evidence obtained from the cellphones of Joseph and his co-conspirators. Through Agent Malone, the government introduced several text messages recovered from Keslin's cell phone. Two of the messages were sent between Keslin and an individual named Angelo on August 15, 2011. In the first message, Keslin wrote to Angelo: "I didn't have my phone with me, just got done with my shift." The response text message from Angelo stated: "Oh, no problem. I wanted to know if you were still selling the Glocks."

Defendant Joseph objected to the introduction of this second message from Angelo (referring to the selling of Glocks), arguing that the admission of this

24

evidence would violate the Confrontation Clause and the Supreme Court's decision in <u>Crawford v. Washington</u>, 541 U.S. 36, 124 S. Ct. 1354 (2004) (interpreting the Confrontation Clause).  The district court overruled Joseph's objection, stating that "<u>Crawford</u> only applies to testimonial evidence."

"We review a preserved Confrontation Clause claim <u>de novo</u>."  <u>United States v. Curbelo</u>, __ F.3d __, 2013 WL 4038746 at *8 (11th Cir. 2013).  The Confrontation Clause of the Sixth Amendment provides:  "In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him."  U.S. Const. amend. VI.  In <u>Crawford</u>, the Supreme Court held that the Confrontation Clause permits the admission of "[t]estimonial statements of witnesses absent from trial . . . only where the declarant is unavailable, and only where the defendant has had a prior opportunity to cross-examine."  <u>Crawford</u>, 541 U.S. at 59, 124 S. Ct. at 1369.

The rule announced in <u>Crawford</u> "applies only to testimonial evidence." <u>United States v. Brown</u>, 441 F.3d 1330, 1359 (11th Cir. 2006).  "Testimonial statements include statements that are the 'functional equivalent' of in-court testimony, such as affidavits, depositions, prior testimony and 'statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial.'"  <u>Curbelo</u>, 2013 WL 4038746 at *8 (quoting <u>Crawford</u>, 541 U.S. at 51-52, 124 S. Ct. at 1364).

25

Here, the text message from Angelo to Keslin concerning the selling of firearms was not testimonial; the text message was merely part of a private conversation between two individuals.  See Brown, 441 F.3d at 1360 (holding that a private telephone conversation between mother and son, conducted in a private family setting, was not testimonial).  The text message "was not made under examination," and "was not made under circumstances leading an objective person to reasonably believe the statement would be available for use at a later trial."  See id.; see also United States v. Hendricks, 395 F.3d 173, 181 (3d Cir. 2005) (holding that "surreptitiously monitored conversations and statements" recorded by law enforcement are not testimonial under Crawford).  Accordingly, the district court did not err in admitting the text message.

In sum, Defendant Joseph's trial contained no errors warranting a reversal of his convictions on Counts 1, 2, 4, and 5.  We now turn to sentencing issues.

## VI.  SENTENCING FACTS

### A.    Presentence Investigation Report

The Presentence Investigation Report ("PSI") grouped Defendant Joseph's offenses together pursuant to U.S.S.G. § 3D1.2(d) and assigned him a base offense level of 26 under U.S.S.G. § 2M5.2.  Joseph did not receive any other enhancements or adjustments.  The total offense level of 26, combined with a criminal history category of I, yielded a guidelines range of 63 to 78 months'

26

imprisonment.  Joseph's offenses in Counts 1, 2, and 3 each carried a maximum sentence of 5 years, with no mandatory minimum.  His offenses in Counts 4 and 5 each carried a maximum sentence of 10 years, again with no mandatory minimum.

The PSI expressly declined to recommend a mitigating-role reduction (or an aggravating-role enhancement) because both Joseph and Keslin had voluntarily engaged in the conspiracy and had "actively pursued different avenues to ensure the firearms were smuggled to Haiti."  The PSI stated that Keslin purchased the majority of the firearms, provided the truck, and gave Joseph money for the shipping fees.  But Joseph also purchased firearms, registered the truck in his name, and made the shipping arrangements.

The PSI further declined to recommend a reduction for acceptance of responsibility, stating that Joseph had not yet provided a statement accepting responsibility.  The PSI also noted that, while Joseph had admitted certain aspects of his own conduct, he denied that he was responsible for the actions of others.

## B.    Joseph's Objections to the PSI

Defendant Joseph filed objections to the PSI, arguing that he was entitled to (1) a two-level reduction for his minor role in the offense under U.S.S.G. § 3B1.2(b), and (2) a two-level reduction for acceptance of responsibility under U.S.S.G. § 3E1.1(a).  Regarding the minor-role reduction, Joseph argued that he was less culpable than his brother Keslin or cousin Lauricin.  Specifically, Joseph

27

purchased only 3 of the 12 firearms discovered on the truck; did not provide any money for the purchase or shipping of the truck; and did not make any shipping arrangements or fill out any shipping documents. As to acceptance of responsibility, Joseph contended that, in his September 12 post-arrest interview, he admitted to "virtually every element" of his substantive offenses, and denied only his involvement in a conspiracy because "he acted alone."

Prior to sentencing, Joseph also filed a sentencing memorandum, requesting a variance below the applicable advisory guidelines range. In support, Joseph reasserted that he played a minor role in the conspiracy and that he had accepted full responsibility for his actions. Additionally, Joseph pointed out that he cooperated with law enforcement, that he was a first-time offender, that he was generally a good person, and that his incarceration would negatively impact his children.

## C. Sentencing Hearing

At the sentencing hearing, Joseph indicated that he had no factual objections to the PSI, but he reasserted his objections to the guidelines calculations, asking for reductions for his minor role and acceptance of responsibility.

The district court denied Joseph's requests for these reductions, stating that it had "no hesitation in finding that [Joseph] was equally culpable with his brother. And, furthermore, he did go to trial." The district court noted that, while Joseph's

28

giving "some information" to law enforcement may have been "helpful," he had never made a clear statement accepting responsibility. The district court adopted the PSI's guidelines calculations, which yielded an advisory guidelines range of 63 to 78 months.

Joseph then reiterated his arguments for a downward variance. Additionally, Joseph's stepson and Joseph himself addressed the district court. Joseph's stepson stated that Joseph had taken care of their family and that Joseph understood the seriousness of his offense and was "not a bad man." Joseph himself apologized for his conduct and asked the court and his family for forgiveness. Joseph stated that he had accepted full responsibility for his conduct "from the beginning," and that, although he believed that he was helping his family, his actions hurt himself and his family. Joseph then attempted to minimize his culpability, stating:

> I only went to trial to prove to the [c]ourt and my family of my specific involvement, which was [that] I did . . . give my brother two plastic bags to put in the truck for my cousins [who] are police officers in Haiti. That's all I did, and no one (inaudible) what was in the bags.

The government requested a "mid-range" sentence of 70 months because Joseph's conspiracy involved a total of 12 firearms and because smuggling firearms to Haiti had "strong implications" for the Haitian government and U.S. foreign policy.

The district court denied Joseph's request for a downward variance, stating:

[Joseph] is a first-time offender, but that's been taken care of in the guidelines.  There is no criminal history.  This may sound to some people like a minor offense, but it's very serious.  Sending guns into especially Haiti, with the conditions there, we know that the guns would go for a very high price.  And so this offense is motivated by greed more than motivated by a desire to help people in Haiti.  I will sentence [Joseph] within the guideline [range] and at the low end.

The district court further stated that it had considered the statements of all parties, the PSI, the advisory guidelines, and the statutory factors.  The district court indicated that a sentence at the low end of the advisory guidelines range was warranted based on "offender characteristics."   The district court then sentenced Joseph to a total 63-month term of imprisonment, consisting of 60 months as to Counts 1, 2, and 3, and 63 months as to Counts 4 and 5, all to be served concurrently.  The district court also imposed a total three-year term of supervised release.  After the sentence was imposed, Joseph indicated that he had no objections.

## VII.  SENTENCING ANALYSIS

On appeal, Joseph raises three sentencing issues, arguing that the district court erred in (1) denying a 2-level reduction under U.S.S.G. § 3B1.2(b) for his minor role in the offense; (2) denying a 2-level reduction under U.S.S.G. § 3E1.1(a) for acceptance of responsibility; and (3) denying his request for a downward variance from the advisory guidelines range of 63 to 78 months, thereby making his sentence unreasonable.

## A.    Applicable Legal Standards

We review for "clear error" a district court's denial of a role reduction.

United States v. Bernal-Benitez, 594 F.3d 1303, 1320 (11th Cir. 2010).  We also

review for clear error a district court's determination that a defendant is not entitled

to a reduction for accepting responsibility.  United States v. Amedeo, 370 F.3d

1305, 1320 (11th Cir. 2004).  We cannot find clear error unless we are left with a

definite and firm conviction that a mistake has been made.  United States v.

Crawford, 407 F.3d 1174, 1177 (11th Cir. 2005).  The defendant bears the burden

of establishing by a preponderance of the evidence both his minor role in the

offense and his acceptance of responsibility.  United States v. De Varon, 175 F.3d

930, 939 (11th Cir. 1999) (en banc) (minor role); United States v. Williams, 408

F.3d 745, 756 (11th Cir. 2005) (acceptance of responsibility).

We review the reasonableness of a sentence under a deferential abuse of

discretion standard.  Gall v. United States, 552 U.S. 38, 41, 128 S. Ct. 586, 591

(2007).  The party challenging a sentence bears the burden of establishing that it is

unreasonable.  United States v. Talley, 431 F.3d 784, 788 (11th Cir. 2005).[8]

---

[8] Both Joseph and the government suggest that plain-error review applies to Joseph's sentencing arguments because he failed to object to any adverse rulings at the conclusion of his sentencing hearing. However, in the PSI addendum and at sentencing, Joseph argued that he was entitled to a mitigating role reduction and a reduction for acceptance of responsibility.  Joseph also argued that a sentence within the applicable guidelines range was excessive in light of the 18 U.S.C. § 3553(a) factors.  Although Joseph did not reiterate his objections after the district court imposed the sentence, the record shows that the district court clearly understood Joseph's arguments and specifically rejected them.  See United States v. Weir, 51 F.3d 1031, 1033 (11th

## B.    Mitigating Role Reduction

The Guidelines permit a two-level reduction in the base offense level for a defendant who played a minor role in the offense.  U.S.S.G. § 3B1.2(b).  Two principles guide a district court's consideration of this reduction: "(1) the court must compare the defendant's role in the offense with the relevant conduct attributed to him in calculating his base offense level; and (2) the court may compare the defendant's conduct to that of other participants involved in the offense."  Bernal-Benitez, 594 F.3d at 1320 (internal quotation marks omitted).  However, a defendant is not automatically entitled to a minor role reduction merely because he was "somewhat less culpable than the other discernible participants."  Id. at 1320-21.  Indeed, a conspiracy can exist in which no participant plays a minor role.  United States v. Zaccardi, 924 F.2d 201, 203 (11th Cir. 1991).

In this case, Joseph has not carried his burden to show the district court clearly erred by denying his request for a minor-role reduction.  As shown at trial and reflected in the PSI, Joseph played an active and intentional role in attempting to illegally transport at least three firearms to Haiti.  See United States v. Wade, 458 F.3d 1273, 1277 (11th Cir. 2006) ("[A] failure to object to allegations of fact

Cir. 1995) (providing that a party does not have to repeat its objection to the PSI after the imposition of the sentence in order to preserve it where the court understood the objection). Thus, we apply our ordinary standards of review.

in a PSI admits those facts for sentencing purposes."). Although the PSI acknowledged that Joseph's contribution to the conspiracy may have been "slightly less" than his brother Keslin's, Joseph was not automatically entitled to a minor-role reduction merely because he may have been slightly less culpable than his brother. See Zaccardi, 924 F.2d at 203.

## C.    Reduction for Acceptance of Responsibility

Section 3E1.1(a) provides for a two-level reduction if a defendant "clearly demonstrates acceptance of responsibility for his offense." U.S.S.G. § 3E1.1(a). This reduction is not intended to apply to a defendant who denies at trial the essential factual elements of his guilt and expresses remorse only after he is convicted. Id., comment. (n.2). A defendant who exercises his constitutional right to trial may receive an acceptance-of-responsibility reduction in "rare situations," such as "where a defendant goes to trial to assert and preserve issues that do not relate to factual guilt (e.g., to make a constitutional challenge to a statute or a challenge to the applicability of a statute to his conduct)." United States v. Caraballo, 595 F.3d 1214, 1232-33 (11th Cir. 2010) (quoting U.S.S.G. § 3E1.1(a), comment. (n.2)). In such a case, the district court's determination regarding acceptance of responsibility will be based primarily on the defendant's pretrial statements and conduct. Id.

33

Here, the district court did not clearly err in denying Joseph's request for a two-level reduction for acceptance of responsibility under § 3E1.1(a).  Although Joseph's decision to proceed to trial does not automatically preclude him from receiving an acceptance-of-responsibility reduction, this is not one of those "rare situations" where such a reduction is warranted.  See Caraballo, 595 F.3d at 1232-33.  Joseph admitted some of his involvement in his post-arrest interview, but he proceeded to trial to challenge his factual guilt.  Moreover, even after conviction, Joseph never submitted a statement accepting personal responsibility for his involvement in the conspiracy and, by maintaining that he acted alone to ship only three firearms to Haiti, Joseph attempted to minimize his role in the conspiracy.  See id. at 1233 ("[A] defendant has not accepted responsibility where he proceeded to trial and consistently attempted to minimize his role, despite . . . evidence to the contrary." (internal quotation marks omitted)).

## D.    Reasonableness

In reviewing the reasonableness of a sentence, we first consider whether the district court committed a procedural error, such as improperly calculating the applicable guidelines range, treating the Guidelines as mandatory, or failing to consider the 18 U.S.C. § 3553(a) factors.  United States v. Gonzalez, 550 F.3d 1319, 1323 (11th Cir. 2008).  If we determine that a sentence is procedurally sound, we review a sentence for substantive reasonableness by examining the

34

totality of the circumstances, which includes an inquiry into whether the § 3553(a) factors support the sentence in question.  Id. at 1323-24.[9]

We "will not second guess the weight (or lack thereof) that the [district court] accorded to a given factor . . . as long as the sentence ultimately imposed is reasonable in light of all the circumstances presented."  United States v. Snipes, 611 F.3d 855, 872 (11th Cir. 2010) (internal quotation marks omitted). Furthermore, although we do not "automatically presume a sentence within the guidelines range is reasonable," we ordinarily expect a within-guidelines sentence to be reasonable.  United States v. Hunt, 526 F.3d 739, 746 (11th Cir. 2008).

In this case, the district court did not abuse its discretion by declining to vary below the advisory guidelines range, as Joseph's 63-month sentence, imposed at the lowest end of the guidelines range, was procedurally and substantively reasonable.  First, we discern no procedural error in the district court's sentencing. The record shows that the district court properly calculated Joseph's advisory guidelines range and considered all the appropriate § 3553(a) factors.

---

[9] The § 3553(a) factors include: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (3) the need for deterrence; (4) the need to protect the public; (5) the need to provide the defendant with needed educational or vocational training or medical care; (6) the kinds of sentences available; (7) the Sentencing Guidelines range; (8) pertinent policy statements of the Sentencing Commission; (9) the need to avoid unwarranted sentencing disparities; and (10) the need to provide restitution to victims.  18 U.S.C. § 3553(a).

Second, Joseph's sentence was substantively reasonable in light of the record and the § 3553(a) factors.  The 63-month sentence fell at the low end of the applicable guidelines range, and we ordinarily expect such a sentence to be reasonable.  See Talley, 431 F.3d at 788.  Moreover, in sentencing Joseph, the district court properly emphasized the seriousness of transporting firearms into Haiti and noted that Joseph's conduct was motivated more by greed than a desire to help his cousins.  Indeed, evidence showed that the United States strictly regulates the transport of firearms to Haiti and that Glock firearms can be sold in that country for a significant profit.  In this light, the district court could reasonably determine that a below-guidelines sentence would not sufficiently reflect the seriousness of the offense, promote respect for the law, provide just punishment, and deter Joseph and others from similar conduct.  See 18 U.S.C. § 3553(a); United States v. Clay, 483 F.3d 739, 743 (11th Cir. 2007) ("The weight to be accorded any given § 3553(a) factor is a matter committed to the sound discretion of the district court . . . ."  (internal quotation marks omitted)).  Thus, even without Count 3, we cannot say that Joseph's 63-month total sentence, imposed at the low end of the guidelines range, was unreasonable.

## VIII.  CONCLUSION

In light of the foregoing, we affirm Joseph's convictions and sentences on Counts 1, 2, 4, and 5; vacate his conviction and sentence on Count 3; and remand for the district court to enter a corrected judgment.[10]

**AFFIRMED IN PART, VACATED IN PART, AND REMANDED.**

---

[10]As shown by the calculations above, Count 3 did not affect Joseph's guidelines calculations, and Joseph was given a reasonable sentence at the low end of the guidelines range. Thus, we do not require the district court to hold a new sentencing hearing. See, e.g., United States v. McGarity, 669 F.3d 1218, 1270-71 (11th Cir. 2012) (vacating convictions and sentences on some counts of the defendants' indictment, without requiring the district court to resentence those defendants). However, the district court does retain the discretion to have an additional sentencing hearing if it concludes the vacatur of Count 3 affects in any way its sentencing decision on the other counts.

37