[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 10-11481

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
MARCH 4, 2011
JOHN LEY
CLERK

D.C. Docket No. 1:09-cr-00509-KOB-JEO-1

UNITED STATES OF AMERICA,

                                        Plaintiff-Appellant,

                    versus

ARACELI ALMANZAR,
a.k.a. Araceli E. Almanzar,

                                        Defendant-Appellee.

_____

Appeal from the United States District Court
for the Northern District of Alabama

_____

(March 4, 2011)

Before CARNES and PRYOR, Circuit Judges, and SEITZ,[*] District Judge.

PRYOR, Circuit Judge:

_____

[*]Honorable Patricia A. Seitz, United States District Court Judge for the Southern District of Florida, sitting by designation.

This appeal is about usurping the role of the jury in a criminal trial by relying upon racial stereotypes. The key question presented is whether there is sufficient evidence to support a jury verdict that Araceli Almanzar knowingly possessed with the intent to distribute 500 grams or more of methamphetamine. 21 U.S.C. § 841(a)(1), (b)(1)(A). The United States appeals the judgment of acquittal and conditional grant of a new trial entered in favor of Almanzar after a jury found her guilty of the charged offense. During a traffic stop of a truck loaded with 6,665 grams of methamphetamine in a hidden compartment, Almanzar exercised control over the truck and gave both written and verbal consent to its search, lied to a state trooper about the ownership of the truck and her acquisition of it, presented a phony bill of sale, and appeared to be so nervous as to be on the verge of a "panic attack," with her hands shaking and her mouth dry. Almanzar later admitted that she had lied to the state trooper because her travel by bus from Dallas to Atlanta with her brother to retrieve the truck from two strangers was "suspicious." She also admitted that she knew the truck contained "something we were not supposed to have." Before the district court entered a judgment of acquittal, it stated that "life is different for a Hispanic woman in a male dominated culture, . . . the cultural expectations are different and that Hispanic women frequently, basically, do what their male family members ask them to do without

2

asking lots of questions." The United States argues that the evidence was sufficient to support the jury's verdict and the district court applied the wrong standard of review, relied on speculation and impermissible stereotypes, considered information not in the record, and substituted its judgment for that of the jury. The United States also argues that the jury's verdict was not a miscarriage of justice that would support the grant of a new trial. We agree with both arguments of the United States. We vacate in part, reverse in part, and remand with instructions to reinstate the jury's verdict and conduct further proceedings consistent with this opinion.

## I. BACKGROUND

On December 8, 2009, State Trooper Robbie Autery stopped a westbound truck on Interstate 20 for failing to display a valid license plate. Almanzar was a passenger in the truck, and her older brother, Rogelio, was the driver. The truck stopped next to a fuel pump at a gas station. Trooper Autery asked Rogelio for his driver's license, but Rogelio responded that he did not have a license.

When Trooper Autery requested the vehicle registration, Almanzar reached over Rogelio to hand Autery a purported bill of sale for the truck. Almanzar's hands were shaking. Almanzar told Autery that her boyfriend had bought her the truck. Almanzar's statements were untrue: her boyfriend had not bought the truck,

3

and she did not own it. Even the bill of sale was phony. After Almanzar handed Autery the phony bill of sale, Autery asked her for her driver's license and asked her to accompany him to his patrol car where he could check her license and information about the truck.

While they were in his patrol car, Trooper Autery asked Almanzar how she had obtained the truck, and Almanzar responded that she and her brother had traveled by bus from Dallas to Atlanta, had retrieved the truck at her boyfriend's house, and were returning to Dallas. During this conversation, Autery noticed that Almanzar was breathing heavily and her voice was "smacking, like real dry mouth." Autery asked Almanzar if she was okay, and Almanzar responded "in an unsure voice" that she was fine. Autery was concerned that Almanzar "was about to have a panic attack."

Trooper Autery noticed that Rogelio was standing next to the fuel pump and asked Rogelio whether the truck needed gas. Rogelio responded affirmatively. Autery asked Rogelio to turn on the motor of the truck, and Autery then saw that the fuel gauge for the truck indicated that the fuel tank was full. Autery told Rogelio that the truck had plenty of fuel, but Rogelio responded that the fuel gauge was broken. When Autery returned to his patrol car, he asked Almanzar why her brother had parked next to the fuel pump and had said the truck needed

4

gas and had a broken fuel gauge, and Almanzar said she did not know. Almanzar told Autery that the truck did not need gas and the fuel gauge was not broken.

Trooper Autery asked Almanzar where her boyfriend lived in Atlanta, and Almanzar responded that she did not know the address. Almanzar said she had taken a cab from the bus station to her boyfriend's residence, but Autery told Almanzar that she would have had to tell the cab driver an address for her destination. Almanzar did not respond to that assertion.

Trooper Autery asked Almanzar for consent to search the truck, and Almanzar consented verbally and in writing. Autery discovered a hidden compartment in the center console that contained several packages wrapped in cellophane. Autery placed Almanzar and Rogelio in handcuffs until he could determine the contents of the packages. Autery called a supervisor, Corporal Lett, for assistance, and Lett called Agent Derek Jones of the Alabama Bureau of Investigation. Lett and Autery recovered seven packages that appeared to contain methamphetamine.

After Trooper Autery warned Almanzar of her rights to remain silent and to counsel, Autery questioned her. Almanzar told Autery that she knew something was in the truck, but she did not know what it was. Almanzar also admitted that the truck did not belong to her boyfriend. Almanzar explained that she had lied

5

about her travel because she did not want to tell Autery that she and her brother had taken a bus from Dallas to Atlanta and suspiciously had retrieved a truck from two strangers.

Agent Jones also questioned Almanzar at the scene. Almanzar stated that she and Rogelio were traveling from Atlanta to Dallas to retrieve a truck that Rogelio had told her "was supposed to [contain] money." Jones asked Almanzar why she had lied to Trooper Autery about her journey, and Almanzar said, "if I told him that we just came from Dallas to Atlanta to pick up a truck, . . . he would have thought that was suspicious." When Jones stated that having money was not illegal, Almanzar said, "I knew it was something that we're not supposed to have."

The officers interviewed Almanzar again at the office of the Drug Enforcement Administration after Almanzar said that she understood her rights. Almanzar told Jones that she and Rogelio had traveled by bus from Dallas to Atlanta where they had met two unknown Hispanic males. Those strangers took Rogelio and Almanzar to a restaurant, where they waited "several hours" for the strangers to return with the truck. Almanzar and Rogelio purchased gas for the truck and were en route to Dallas when Trooper Autery stopped them.

Although Almanzar and Rogelio were siblings, they were dissimilar in their interactions with the officers. When Trooper Autery asked Rogelio for the vehicle

6

registration, Rogelio was passive while Almanzar took the lead in responding to Autery, claimed ownership of the truck, and provided Autery a phony bill of sale. Trooper Autery observed that Rogelio, on the one hand, spoke in broken English and provided Autery an identification card from Mexico. Almanzar, on the other hand, spoke English without difficulty and produced an American driver's license. Agent Jones determined that Almanzar was a lawful resident of the United States, but Rogelio was an illegal immigrant. Agent Jones discovered that Almanzar had between $150 and $160 on her person, but Rogelio had fewer than $10.

Agent Jones was unable to verify the ownership of the truck. The purported bill of sale that Almanzar produced to Trooper Autery listed a seller and purchaser who had never lived at the addresses stated on that document. The purported bill of sale did not state an amount of purchase. Agent Jones was unable to determine whether the alleged purchaser and seller even existed. The truck contained no title, registration, insurance information, or license plate.

A federal indictment charged Almanzar with knowingly possessing with intent to distribute 500 grams or more of methamphetamine. 21 U.S.C. § 841(a)(1), (b)(1)(A). During jury selection, some members of the venire expressed strong opinions about illegal immigration and were questioned separately in private about those opinions. Those members who stated that they could not

7

remain fair and impartial were removed for cause.

At trial, the government presented the testimonies of both Trooper Autery and Agent Jones in addition to a stipulation about the chemical composition of the methamphetamine found in the truck. During cross-examination, Agent Jones testified that Almanzar had said she lied to Autery in part because she feared he would want "to look in the truck." Jones stated that he had not taped Almanzar's statement, included the remark in his notes of her interview, or included the remark in an affidavit. Almanzar moved to strike Jones's testimony about Almanzar's undisclosed remark. The district court granted that motion and instructed the jury to disregard that portion of Jones's testimony.

Almanzar moved for a judgment of acquittal on the ground that the evidence gave equal or nearly equal circumstantial support to a theory of guilt and to a theory of innocence. Almanzar argued that it was plausible that she had lied because she was worried that her brother would be deported as an illegal alien. Almanzar also argued that there was insufficient evidence that she had knowingly possessed the methamphetamine with the intent to distribute.

The United States responded that Almanzar's nervous demeanor and false statements would allow a jury to find her guilty of the charged offense. The district court asked, "Isn't that easily plausible with her effort to protect her

brother who was an illegal alien?"  The United States responded that Almanzar had admitted that the truck contained something she and her brother were not supposed to have.  The district court withheld ruling on Almanzar's motion.

The district court speculated about the reasons for Almanzar's deception when deciding whether to give an instruction about deliberate ignorance.  The United States argued that the district court should give the instruction because the evidence allowed a reasonable inference that Almanzar knew she had been involved in criminal activity.  The prosecutor stated that Almanzar had traveled by bus to Atlanta where she obtained from two unknown men a truck she was supposed to drive to Dallas.  The district court asked whether the government was "saying that no one can innocently take a bus ride from Dallas to Atlanta to then drive back to Dallas a truck for a friend of her brother's, that that in and of itself–oh, and meeting two Hispanic people in Atlanta, when the defendant herself was Hispanic."  The government stated that Almanzar's trip was suspicious, and the district court stated, "But she is going with her big brother.  And isn't it logical that she would be relying upon her big brother in terms of the details and the logistics when he apparently invited her to go with him on this trip?"  The government maintained, based on the circumstantial evidence, that Almanzar's story was implausible.  The district court ruled that the facts were "sufficient . . . to

9

argue that [Almanzar] knew as opposed to [her being] deliberately indifferent" and granted Almanzar's motion to strike the jury instruction.

The jury found Almanzar guilty of knowingly possessing with the intent to distribute 500 grams or more of methamphetamine. 21 U.S.C. § 841(a)(1), (b)(1)(A). The district court revisited Almanzar's motion for a judgment of acquittal. The district court said it was concerned about whether there was sufficient evidence for the jury to find that Almanzar knowingly possessed an illegal substance.

The district court determined that the evidence and the "fact that [the] jury struggled with the case for more than twenty-four hours" suggested that the case of the government was "weak[] . . . on the critical question of whether [Almanzar] knowingly and willfully possessed methamphetamine." The district court stated that it found Almanzar's story "[]plausible" and her assertion that she owned the truck as "inconsistent with a belief that there's something illegal in that vehicle." The district court also found as a "factor that comes into play" that Almanzar's "brother [was] an illegal alien," which was "consistent with her nervousness" and "more consistent with her handing the bill of sale to the trooper and claiming that it was her truck to divert attention from her brother." The district court opined that it was "not sure that [Almanzar] would have done that if she had known that

10

the truck actually contained the quantity of methamphetamine that is involved here or that it contained any illegal substance."

The United States argued that Almanzar's story "regarding her trip and her itinerary is implausible," but the district court disagreed. The district court responded that it found plausible Almanzar's story because she had in fact traveled by bus from Dallas to Atlanta, where she had retrieved the truck, and she was returning to Dallas. When the United States mentioned that Almanzar had said she was meeting strangers in Atlanta, the district court interrupted and stated that Almanzar's "brother" had "[made] the arrangements" and Almanzar was "along for the ride" as "a mere passenger." The district court next inquired whether the prosecutor had ever "gone some place with someone you know and love and trust not knowing all the details of what was going to happen there, who you were going to meet? Maybe when you were a kid . . . ." After the prosecutor stated that Almanzar was not a child, the district court remarked that Almanzar was a "very young Hispanic woman whose brother asked her to go somewhere with him" and it was not "implausible for her to go with her brother and not know who they are meeting in Atlanta." The prosecutor clarified that Almanzar was a "twenty-seven year old woman with life experiences" who had been "asked, last minute, to take this trip to Atlanta, to get on this bus and [travel] for twelve hours, through five

states and seven hundred miles," to retrieve a truck that she did not "know anything about" from strangers "who [were] going to pick her up at the bus station."

Despite the insistence of the government that Almanzar was an independent adult, the district court focused on the fact that Almanzar was "with her brother" and the assumption that "life is different for a Hispanic woman in a male-dominated culture." The prosecutor inquired if Almanzar "should be treated differently because she is a Hispanic woman," and the district court insisted "[t]hat the cultural expectations are different and . . . Hispanic women frequently, basically, do what their male family members ask them to do without asking lots of questions." The prosecutor argued that it "is just completely on the verge of preposterous" to infer that Almanzar accompanied blindly her brother and would not suspect criminal activity. The district court asked rhetorically whether Almanzar would remain in Atlanta alone, to which the prosecutor explained it was a viable option because Almanzar "had all the money, she had the credit cards" and she was capable of questioning the transaction and refusing to participate. After further discussion, the prosecutor argued that Almanzar's story was "implausible" and that the finding of the jury was supported by her "inconsistent statements," her "nervousness," her travel from Dallas to Atlanta, her role as "the

12

only occupant in that truck that [spoke] any English," and her control of "all the money."

The district court granted Almanzar's motion for a judgment of acquittal and set aside the jury verdict. The district court stated it had a "hard time seeing how a rational jury could, in this case, find proof beyond a reasonable doubt that Ms. Almanzar knowingly and willfully possessed methamphetamine." The district court stated that it was "concerned about two aspects of [the] case": first, that the jury might not have complied with the instruction to disregard Agent Jones's testimony that Almanzar feared Trooper Autery would "look in the truck" and, second, that some of "the very strong anti-immigrant sentiments that were expressed" during voir dire "in some way tainted the jury that was selected."

Almanzar later moved conditionally for a new trial. Almanzar argued that, in the event the district court was reversed on appeal, she was entitled to a new trial based on "the reason's [sic] stated in the Court's grant of [her] motion for judgment of acquittal." The district court granted the motion on the ground that it "[found], alternatively, that the jury's verdict reflects a miscarriage of justice." After the United States filed this appeal, this panel unanimously agreed to decide the appeal without oral argument. 11th Cir. R. 34–3.

## II. STANDARDS OF REVIEW

Two standards of review govern this appeal. First, a decision to set aside a jury's verdict of guilty and enter a judgment of acquittal based on the insufficiency of the evidence is entitled to no deference. United States v. Greer, 850 F.2d 1447, 1450 (11th Cir. 1988). Because we view the evidence in the light most favorable to the government, a conviction may not be disturbed "on the ground of insufficient evidence unless no rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." United States v. US Infrastructure, Inc., 576 F.3d 1195, 1203 (11th Cir. 2009) (internal quotation marks omitted). The jury is free to choose among reasonable inferences to be drawn from the evidence presented at trial, and the district court must accept all reasonable inferences and credibility determinations made by the jury. United States v. Molina, 443 F.3d 824, 828 (11th Cir. 2006). The district court may not consider facts that were not presented to the jury. United States v. Miranda, 425 F.3d 953, 961 (11th Cir. 2005). We presume that jurors follow the instructions given by the district court. United States v. Ramirez, 426 F.3d 1344, 1352 (11th Cir. 2005). Second, we review the grant of a new trial based on the weight of the evidence more closely than the grant of a new trial on other grounds. Butcher v. United States, 368 F.3d 1290, 1297 (11th Cir. 2004). Although we do not review the grant of a new trial based on the weight of the evidence de novo,

our review "is not much different" because we want to be sure "'that the judge d[id] not simply substitute [her] judgment for that of the jury.'" Id. (quoting Conway v. Chem. Leaman Tank Lines, Inc., 610 F.2d 360, 363 (5th Cir. 1980)). If the record establishes that the evidence did not "'preponderate [so] heavily against the jury's verdict'" as to lead to a "'miscarriage of justice,'" we will conclude that the district court afforded too little deference to the jury's verdict and exceeded its authority by granting a new trial. Id. (quoting United States v. Martinez, 763 F.2d 1297, 1313 (11th Cir. 1985)).

### III. DISCUSSION

In our adversary system, there is a clear demarcation between the role of the district court and the jury. The district court superintends the admission of evidence, after which the jury, "[a]s the ultimate fact-finder . . . determine[s], finally, where the truth in any case lies." United States v. Frazier, 387 F.3d 1244, 1272 (11th Cir. 2004) (en banc). These separate functions ensure that the verdict is based "on relevant and reliable evidence, rather than on speculation or otherwise unreliable conjecture." Id.

In this case, the function of the jury was upended. The United States and Almanzar presented the jury with irreconcilable stories about whether she knew the purpose for her trip and the reason that she misled an investigating officer

15

about her travel. Almanzar argued that she was unaware of the illegal cargo and lied to Trooper Autery to prevent her brother, an illegal alien, from being deported. The United States presented evidence that Almanzar knew the vehicle contained an illegal substance and lied to thwart detection of the substance. The jury rationally found that Almanzar knew she was in possession of an illegal substance. The district court substituted its judgment for that of the jury.

When viewed in the light most favorable to the government, the record establishes that Almanzar knew about the methamphetamine. Knowledge can be inferred when the defendant exercises control over a vehicle in which an illegal substance is concealed, but when the substance is hidden in a secret compartment, there must also be "'circumstances evidencing a consciousness of guilt on the part of the defendant.'" United States v. Stanley, 24 F.3d 1314, 1320 (11th Cir. 1994) (quoting United States v. Gonzalez-Lira, 936 F.2d 184, 192 (5th Cir. 1991)). Almanzar exhibited consciousness of her guilt. She was openly unnerved during the traffic stop by Trooper Autery, she provided an implausible story about retrieving the truck from her boyfriend whose address she did not know, she lied to Autery about who gave her the truck, and she provided phony proof of ownership. See id. at 1321; United States v. Leonard, 138 F.3d 906, 909 (11th Cir. 1998). The jury did not have to imagine why Almanzar lied; Almanzar told

Agent Jones that she was transporting something she was "not supposed to have" and she knew the true story would arouse Autery's suspicions. This evidence was more than sufficient to support Almanzar's conviction.

The district court erred by assuming facts not in evidence, making unsupported assumptions about Hispanic culture, and drawing inferences from the evidence that the jury necessarily had rejected to find that Almanzar was innocent. The district court assumed that Almanzar's brother "[made] all the arrangements" and had "invited" Almanzar to accompany him as a "mere passenger," but the evidence established that Almanzar to a large degree was in control of the return trip. Almanzar was in possession of the phony bill of sale and the majority of the money, and she dominated the conversation with Trooper Autery. The district court based its assumptions, at least in part, on a stereotype that a Hispanic woman would trust blindly her male sibling, but that information was never presented to the jury. See Miranda, 425 F.3d at 961. The district court also construed evidence in a manner inconsistent with the finding of the jury that Almanzar was guilty. See Molina, 443 F.3d at 828. The district court insisted that Almanzar acted nervous because she feared Autery would discover that her brother was an illegal alien. Almanzar made this argument during closing arguments, but the jury rejected it.

17

The district court also erred in weighing the potential effects of the undisclosed remark by Agent Jones and an anti-immigrant sentiment expressed during voir dire because neither concern related to the sufficiency of the evidence. The basis on which to grant a post-verdict acquittal "'is that the evidence was insufficient to sustain a conviction.'" Miranda, 425 F.3d at 962 (quoting United States v. Fozo, 904 F.2d 1166, 1171 (7th Cir. 1990)). The evidence was more than sufficient to find that Almanzar knowingly possessed with the intent to distribute methamphetamine.

Moreover, there is no evidence that either Agent Jones's remark or the sentiments expressed during voir dire influenced the jury in any way. The district court instructed the jury to disregard Agent Jones's remark, and we presume the jury complied with that instruction. See United States v. Simon, 964 F.2d 1082, 1087 (11th Cir. 1992) ("A curative instruction purges the taint of a prejudicial remark because 'a jury is presumed to follow jury instructions.'" (quoting Adams v. Wainwright, 709 F.2d 1443, 1447 (11th Cir. 1983)). The few members of the venire who expressed a potential bias that would affect their ability to be impartial were removed from the jury for cause. Almanzar cites no evidence that would suggest the jury who convicted Almanzar was "tainted."

The district court also exceeded its authority by granting conditionally a

18

new trial for Almanzar. Because the district court provided no explanation for its determination that the verdict constituted a miscarriage of justice, see Fed. R. Crim. P. 29(d)(1), we presume that its decision rests on the same grounds as those it provided when it granted Almanzar a judgment of acquittal. There exists no legitimate basis to label the jury's verdict a miscarriage of justice or to conclude that another error required a new trial. Put simply, the district court disregarded its duty to view the evidence in a light most favorable to the jury's verdict and supplanted the findings of the jury with its interpretation of the evidence and unfounded stereotypes about Hispanic culture and the role of women in that culture.

## IV. CONCLUSION

We **VACATE** the judgment of acquittal in favor of and **REVERSE** the decision to grant conditionally a new trial to Almanzar.

**VACATED IN PART, REVERSED IN PART, AND REMANDED.**