[PUBLISH]

In the

# United States Court of Appeals

### For the Eleventh Circuit

_____

No. 20-14315

_____

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

*versus*

FRANCISCO MOREL,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Florida
D.C. Docket No. 1:19-cr-20441-RS-6

_____

Before WILLIAM PRYOR, Chief Judge, and ROSENBAUM and MARCUS, Circuit Judges.

WILLIAM PRYOR, Chief Judge:

Francisco Morel challenges his convictions for cocaine possession on two grounds: that the trial judge should not have instructed the jury about the elements of conspiracy after Morel's cross-examination of a witness and that there was legally insufficient evidence for his convictions. But the district court accurately explained a legal term that a witness misunderstood. And under the prudent-smuggler doctrine, the jury had sufficient evidence to find that Morel had the *mens rea* required for his convictions. We affirm.

## I. BACKGROUND

Federal agents arrested Morel as part of a bust of a cocaine-trafficking operation that involved the *Sea Hunter*, a 54-foot fishing vessel. Federal officers tracked the *Sea Hunter* on its return from the Dominican Republic, where it had been loaded with cocaine, to a house on the coast of southern Florida. The house was uninhabitable, with no running water, and there was no sign that anyone was living there. Federal officers who had been monitoring the *Sea Hunter* approached when they saw people begin to unload the ship. They arrested three of Morel's co-defendants, Gregorio Martinez, Luis Carlos Melendez, and Garibaldo Paulino, at the ship. They arrested co-defendant Rafael Gracesqui hiding under a

parked car. And they arrested Morel inside the house and Joel Moreno Rosario outside of it.

On board the *Sea Hunter*, officials found over 400 kilograms of cocaine organized into hundreds of bricks. Based on Paulino's estimates at trial, the *Sea Hunter* transported roughly $11.6 million of cocaine. There was so much cocaine involved in the transaction that the *Sea Hunter* smelled of cocaine.

A grand jury indicted all six men on four counts. Count one charged conspiracy to import cocaine, 21 U.S.C. § 963, count two charged importation of cocaine, *id.* § 952(a), count three charged conspiracy to possess cocaine with the intent to distribute it, *id.* § 846, and count four charged possession of cocaine with intent to distribute it, *id.* § 841(a)(1).

Morel and Martinez pleaded not guilty and proceeded to trial, where Paulino and Moreno testified against them. Morel did not call any witnesses of his own or testify, so his challenge to his conviction turns on the sufficiency of the prosecution's case.

The officers who surveilled the *Sea Hunter* and arrested Morel and his co-defendants testified about the surveillance and bust of the *Sea Hunter*. The prosecution also called a Homeland Security agent, who testified that Morel received a message that gave Morel, who lived in Orlando, the address 1395 Brickell Avenue, Miami the day before the *Sea Hunter* docked in Fort Lauderdale. Paulino had separately met with co-defendant Melendez at the 1395 Brickell Avenue location to discuss offloading the cocaine on

the morning the *Sea Hunter* docked. Melendez told Paulino that, just before he met with Paulino, he had been waiting for some other people who were going to help "pick up the drugs" from the *Sea Hunter*. The Homeland Security agent also testified that the GPS records connected to Morel's cell phone established that its holder traveled from 80 miles north of Miami to the 1395 Brickell Avenue address the day before the *Sea Hunter* arrived in Florida.

Cooperating witnesses Paulino and Moreno testified that Morel would have been at the house only if he had been a trusted and knowledgeable member of the conspiracy. Moreno was the navigator on the *Sea Hunter* on its trip to the Dominican Republic and back. Soon after Moreno arrived at the house in Fort Lauderdale aboard the *Sea Hunter*, Morel arrived carrying a bucket of oil for which the passengers on the boat had called. Moreno and Morel rested in the house together briefly, but they did not discuss the *Sea Hunter*'s cargo.

When Moreno testified that he did not know Morel before they met at the house, Morel's counsel asked Moreno, "[Y]ou're not alleging that you conspired with Mr. Morel in this case[?]" Moreno said, "No." The district court held a sidebar conference in which the prosecution requested an instruction about the requirements of conspiracy. Morel's counsel objected that mid-trial instructions would prejudice his cross-examination, but the district court agreed with the prosecution's request. Moreno had also earlier testified that he did not "conspire[] directly" with Martinez.

After the prosecution on redirect elicited from Moreno that he erroneously believed that to "conspire" with someone, one had to know the individual personally, the district court explained that members of a conspiracy do not have to know each other:

> [G]enerally speaking, under the law, a conspiracy is an agreement by two or more persons to commit an unlawful act. . . . Every member of the conspiracy becomes the agent or partner of every other p[erson]. The Government does not have to prove that all of the people named in the indictment were members of the plan or that those who were members made any kind of formal agreement. The heart of the conspiracy is the making of the unlawful plan itself. . . . A person may become a conspirator without knowing all the details of the unlawful plan or the names and identities of all the other alleged conspirators.

The next day, Moreno testified that although he did not know Morel before Morel arrived with the oil, he was not worried because he "thought that everything was in the family."

Paulino provided further testimony regarding Morel's role in the conspiracy. Paulino testified that he was in frequent contact with Melendez—with whom Morel waited at the house—about the details of the conspiracy and that Paulino, Moreno, and Melendez specifically discussed drug trafficking and referred to cocaine in particular. When Paulino arrived at the house and did not recognize Morel, he asked Melendez what Morel was doing there and "if it was clear for [him] to be there." As Paulino explained, "we[]

[were] trying to mak[e] a drug transaction, so I didn't want to put myself to, you know, expose myself to anybody there that . . . [didn't] belong there." Melendez confirmed that "friends" sent Morel over, so Paulino did not leave, but he testified that he would have fled if he had not been assured that Morel was "clear."

Paulino also explained that Morel was part of a conversation about securing oil for the *Sea Hunter* and volunteered to retrieve the oil because he knew what type was needed. According to Paulino, Morel was hired as a driver for the conspiracy and knew where the cocaine was to be transported after unloading; he even had the address in his phone's GPS. When the *Sea Hunter* arrived, Paulino and Melendez boarded and began to unload the drugs from a hidden compartment. And when Paulino became tired during that process, he asked Melendez if Morel and Martinez—who were inside the house—were going to help. Melendez told him to bring Morel and Martinez from the house onto the *Sea Hunter* to help unload the cocaine. Morel did not do so only because he was still away retrieving oil for the *Sea Hunter*.

After the prosecution rested, Morel moved for a judgment of acquittal based on insufficient evidence. The district court denied the motion. After the jury convicted Morel of counts three and four, Morel again moved for acquittal and for a new trial based on the lack of evidence. The district court denied these motions in a written opinion. The district court sentenced Morel to 82 months of imprisonment and five years of supervised release. Martinez was acquitted.

## II. STANDARDS OF REVIEW

This Court reviews a decision to give jury instructions during trial for abuse of discretion. *United States v. McCoy*, 539 F.2d 1050, 1064 n.22 (5th Cir. 1976) (Wisdom, J.). We likewise "review the denial of a motion for a new trial for abuse of discretion," but we review any issues not raised in the district court for plain error. *United States v. Spoerke*, 568 F.3d 1236, 1244 (11th Cir. 2009) (citation omitted). Under plain-error review, we can reverse only if the error is plain, affects substantial rights, and "seriously affects the fairness, integrity, or public reputation of the judicial proceeding." *United States v. Bobal*, 981 F.3d 971, 975 (11th Cir. 2020) (citation omitted). And we review a denial of a motion for acquittal *de novo* when the defendant made the same challenge in the district court. *United States v. Almanzar*, 634 F.3d 1214, 1221 (11th Cir. 2011). We must affirm the conviction "unless no rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* (citation omitted).

## III. DISCUSSION

We divide our discussion into two parts. First, we explain that the district court did not abuse its discretion when it gave a jury instruction during Moreno's testimony. Second, we explain that sufficient evidence supported the jury's finding that Morel knew that the contraband on the *Sea Hunter* was cocaine.

*A. The District Court Did Not Abuse Its Discretion When It Gave a Corrective Instruction During Moreno's Testimony.*

The district court did not abuse its discretion when it intervened to prevent a misunderstanding of the law of conspiracy that Morel's counsel invited. As we have explained, "[a] trial judge is more than a referee to an adversarial proceeding. Indeed, the judge may question witnesses, comment on the evidence, and *interrupt the trial in order to correct an impropriety.*" *United States v. Harris*, 720 F.2d 1259, 1261 (11th Cir. 1983) (emphasis added). "The judge's participation is limited only by the need to remain impartial." *Id.* at 1262.

A witness, Moreno, used the legal term "conspiracy" incorrectly. He implied that he had to personally know Morel to "conspire" with him. *Cf. United States v. Reeves*, 742 F.3d 487, 498 (11th Cir. 2014). The district court intervened to explain what the legal term meant. Without that intervention, the jury could have been confused about the significance of the facts to which Moreno testified. And the district court gave a curative instruction only after the prosecution's redirect examination made clear that the witness testified based on a misunderstanding of the word "conspire." It was not a departure from neutrality for the district judge to discharge his fundamental duty to "determine the law" and "instruct the jury on the law." *See United States v. Brown*, 996 F.3d 1171, 1183 (11th Cir. 2021) (en banc) (citations omitted).

This curative instruction was far from an impermissible, unfair instruction that one party's evidence is not to be believed. *See,*

*e.g.*, *United States v. Fischer*, 531 F.2d 783, 786 (5th Cir. 1976) (reversing because the trial judge remarked to the jury that "someone obviously didn't tell the truth from the witness stand in this case" and hinted at the testimony the judge had in mind). The district court did not instruct the jury that Moreno lied or that he conspired with Morel but instead left those questions to the jury. The district court only clarified the law.

Morel does not deny that the district court gave accurate instructions. Instead, he argues that the district court departed from its obligatory neutrality by *sua sponte* instructing the jury on the law of conspiracy after having allowed co-defendant Martinez's counsel to ask an indistinguishable question about "conspir[ing]" without a clarifying instruction. We disagree.

To the extent that Morel complains that the prosecution did not object to his trial counsel's question about "conspir[ing]," Morel misunderstands the role of the trial judge. If a party fails to object to testimony at trial, he can forfeit a challenge to that testimony and become obliged to prove plain error on appeal to obtain relief. *See United States v. Turner*, 474 F.3d 1265, 1275 (11th Cir. 2007). But the prosecutor's failure to object did not mean that the trial judge, as "the governor of the trial for the purpose of assuring its proper conduct and of determining questions of law," *Quercia v. United States*, 289 U.S. 466, 469 (1933), *could* not intervene *sua sponte*. And the prosecution, in any event, had requested at the earlier sidebar that the district court give the jury a curative

instruction. The district court did so only after the witness explained his erroneous understanding of a conspiracy.

Morel also argues that the district court was "inconsistent[]" because it allowed Martinez's counsel to ask Moreno whether he "conspired directly" with Martinez but issued clarifying instructions after Morel's counsel attempted a similar inquiry. This argument misses the point. The instruction was correct. If Martinez's counsel's line of questioning likewise should have been followed by a clarifying instruction, that error might have prejudiced the prosecution, but it would not affect Morel's rights. Any unfair advantage to Martinez would not be an unfair disadvantage to Morel. And the jury would have understood the curative instruction that the district court later gave to apply to the entirety of Moreno's testimony, not only his examination by Morel's counsel. After all, the district court prefaced its instruction with the phrase "generally speaking, under the law," and we presume jurors follow their instructions. See *Almanzar*, 634 F.3d at 1223.

Morel concedes that he did not mention this jury instruction in his motion for a new trial, so he must establish that it was plain error not to grant him a new trial on that basis. *Spoerke*, 568 F.3d at 1244. Morel's case for plain error fails at the first step: there was no error.

### B. Sufficient Evidence Supported the Finding that Morel Knew the Sea Hunter Transported Cocaine.

Morel challenges the legal sufficiency of the evidence for his convictions on the ground that the prosecution did not prove he had the requisite *mens rea* for his convictions. Specifically, he argues that the prosecution did not provide sufficient evidence from which the jury could infer that he knew that he was conspiring to possess *cocaine* in particular. Based only on the evidence at trial, Morel contends, he "could have just as easily thought that [*Sea Hunter*]'s cargo was contraband other than drugs, like guns or counterfeit currency or cigarettes."

Morel's challenge fails under the prudent-smuggler doctrine. *United States v. Duenas*, 891 F.3d 1330, 1334 (11th Cir. 2018); *see United States v. Cruz-Valdez*, 773 F.2d 1541, 1547 (11th Cir. 1985) (en banc) ("[A] prudent smuggler is not likely to suffer the presence of unaffiliated bystanders."). Although he also marshals other challenges to his possession convictions, he failed to challenge one of the bases for conviction presented to the jury, so we affirm the district court on the basis Morel does not challenge.

Morel's two convictions—one for conspiracy to possess cocaine with the intent to distribute it and the other for cocaine possession with the intent to distribute it—share the element that he had to know that the substance in the *Sea Hunter* was cocaine. For his conspiracy conviction, the prosecution had to prove beyond a reasonable doubt that Morel "knew the essential nature of the conspiracy," including the type of contraband at issue. *United States v.*

*Ohayon*, 483 F.3d 1281, 1291 (11th Cir. 2007). And for his possession conviction, the prosecution had to prove that Morel knew what substance he possessed. *See* 21 U.S.C. § 841(a)(1); *United States v. Iglesias*, 915 F.2d 1524, 1527 (11th Cir. 1990).

The jury can infer knowledge from circumstantial evidence, and a jury may reasonably infer that "a prudent smuggler is not likely to suffer the presence of unaffiliated bystanders." *Duenas*, 891 F.3d at 1334 (quoting *Cruz-Valdez*, 773 F.2d at 1547). That is, "when the orchestrator of a conspiracy vests substantial trust in an associate to contribute to the scheme, a jury may infer the associate's knowing participation" and that "the smuggler will likely apprise him of the transaction's essential details, including the nature of the contraband involved." *Id.*

The prudent-smuggler doctrine forecloses Morel's challenge to his convictions based on a lack of *mens rea*. Morel's testifying co-conspirators established that Morel was communicating and working closely with at least Melendez, and Paulino testified that Melendez knew that he was participating in a conspiracy to traffic cocaine. Paulino met with Melendez at 1395 Brickell Avenue before the *Sea Hunter* arrived to discuss the offloading of the cocaine. At that time, Melendez told Paulino he was coordinating with other members of the conspiracy. Morel's phone records show that he received the same 1395 Brickell Avenue address, and GPS data from Morel's cellphone confirm that it arrived at that address shortly before the *Sea Hunter* docked in South Florida. A reasonable jury could infer that Melendez and Morel met at 1395 Brickell

Avenue and discussed what they were trafficking. Further, on the night the *Sea Hunter* arrived, when Paulino tired of unloading the cocaine, Melendez told him that he should bring the men from inside the house, including Morel, to help. Morel was away getting oil at the time, but Martinez complied with the request. Melendez would not have invited Morel onto the *Sea Hunter* to help unload cocaine if he was not a trusted co-conspirator, especially because the men who were unloading the cocaine could see what was in the packages they were transferring.

Morel was also privy to the time and remote location of the drug shipment and its eventual destination. Paulino testified that he would not have tolerated the presence of an outsider at the scene of the crime. Moreno likewise testified that he understood everyone at the house to be "in the family." The prosecution did not rely on Morel's mere presence at the crime scene to prove that he knew what contraband he was helping to traffic. Cf. *United States v. Louis*, 861 F.3d 1330, 1334–35 (11th Cir. 2017) (holding the evidence legally insufficient when the defendant had a legitimate pre-existing reason to be at the location of the contraband and there was little evidence of *mens rea* apart from presence at that location). As the district court explained when it denied Morel's motions, a jury could have reasonably found that Morel's co-defendants would not have invited Morel to the secluded location of their docking at the critical moment of unloading if he were not a knowledgeable member of the conspiracy. The jury was also entitled to infer that Morel would not have been entrusted with driving the

cocaine to its next destination without knowing what he was assigned to drive.

Morel's argument—that he traveled across Florida to participate in a multi-million-dollar criminal plan without being privy to what contraband he was going to transport—makes little sense. The jury was entitled to reject it. We cannot set aside either of his convictions on the ground that insufficient evidence established the *mens rea* for his crimes.

Morel also argues that because the cocaine was in the *Sea Hunter* and he was in the house, there was no evidence that he had actual or constructive possession of the cocaine. He argues that he did not directly control the cocaine, nor did he have "dominion" over it or the *Sea Hunter* as required for constructive possession. *See Iglesias*, 915 F.2d at 1528. But the jury was also instructed that it could convict Morel for aiding and abetting the others' conspiracy to possess and their possession of the cocaine. Morel does not argue that the jury was not entitled to convict on this theory, so "he is deemed to have abandoned any challenge of that ground, and it follows that the judgment is due to be affirmed." *Sapuppo v. Allstate Floridian Ins. Co.*, 739 F.3d 678, 680 (11th Cir. 2014).

## IV. CONCLUSION

We **AFFIRM** the judgment of conviction.