[DO NOT PUBLISH]

In the

# United States Court of Appeals

### For the Eleventh Circuit

_____

No. 23-11548

_____

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

*versus*

MICHAEL ADIX,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Middle District of Florida
D.C. Docket No. 8:21-cr-00300-WFJ-MRM-1

_____

Before ROSENBAUM, LAGOA, and WILSON, Circuit Judges.

PER CURIAM:

This case raises alleged trial errors in the exclusion of evidence, and the district court's denial of the defendant's motion for a new trial based on the same evidentiary exclusion.

In short, a jury found Dr. Michael Adix guilty of tax perjury and underreporting his personal income for the 2012 through 2015 tax years. On appeal, he contends that the trial court erred by excluding evidence about corporate tax filings that his wife Corinne Adix made, years after Dr. Adix filed his own fraudulent tax returns. Corinne[1] filed these tax returns in 2018 for two corporations that processed some of the income Dr. Adix earned but failed to report. Dr. Adix contends that evidence of these 2018 filings would've supported his good-faith defense, and that the trial court erred in excluding the evidence on both hearsay and relevance grounds. He also contends that the court erred in denying his motion for a new trial, which he premised on the same evidentiary exclusion.

We assume without deciding, first, that the applicable standard of review here is abuse of discretion,[2] and second, that there was an abuse of discretion. We need not decide these issues because even if the district court did abuse its discretion in excluding

---

[1] To avoid confusion between Dr. Michael Adix and Corinne Adix, we refer to Corinne Adix as "Corinne."

[2] The government asserts that Dr. Adix did not preserve his challenges to the district court's evidentiary rulings on (1) relevance and (2) hearsay grounds, so plain-error review applies to those challenges.

evidence of Corinne's 2018 corporate tax filings, any error was harmless.  The court also did not abuse its discretion in denying the related motion for a new trial.  So we affirm.

## I.    BACKGROUND

Dr. Michael Adix, an emergency-room physician, contracted with hospitals in Missouri, North Carolina, and Georgia to provide medical services.  In doing so, he executed contracts with the hospitals to pay him for these services through different corporations.  The hospitals or third-party staffing companies paid three entities for the medical services Dr. Adix provided:  Pinnacle Healthcare Resources, Inc. ("Pinnacle"), Integrative Care Corporation ("ICC"), and ICORP.

### A.  The Corporations and Their Contracts

Dr. Adix owned Pinnacle, but he contended that his wife Corinne owned and operated ICC and ICORP.  Besides his own testimony, a little evidence at trial supported Dr. Adix's contention that ICC and ICORP were Corinne's corporations.  For instance, Corinne wrote checks on behalf of ICC and ICORP.

On the other hand, Dr. Adix executed several contracts with hospitals' third-party staffing companies, signing his own name on behalf of ICC, ICORP, and Pinnacle.  He did this for years with multiple different staffing companies.  Dr. Adix also appeared to list himself as ICORP's "sole shareholder" and "President" on one of the employment contracts, and ICC's "Pres" on another.  He said he was "authorized" to enter arrangements on these corporations' behalf as one of their "agent[s]."  Notably, none of the contracts

listed Corinne as ICC's or ICORP's corporate president or any other representative for those companies. And none of the hospitals' or staffing companies' records submitted at trial appeared to reference Corinne as an officer or shareholder of ICC or ICORP, either.[3]

Pinnacle, undisputedly Dr. Adix's corporation, had written contracts with ICC and ICORP. These contracts provided amounts that Pinnacle would receive from ICC ($100/hour) and ICORP ($15,000/month) for Dr. Adix's medical services to the hospitals. Dr. Adix testified that ICC and ICORP were established to function like a staffing company: making Dr. Adix's travel arrangements, billing his hours, coordinating his schedule, and paying his business expenses (including Corinne's salary).

### B. The Charged Conduct

The evidence at trial showed that Dr. Adix didn't file his personal income taxes for the period from 2012 through 2015. Eventually, the IRS caught on, began investigating him, and referred the case to the Department of Justice for a potential tax-evasion prosecution. Only after that happened did Dr. Adix belatedly filed his 2012–15 tax returns, in 2015 and 2016. But as we explain below, there were problems with these as well.

Dr. Adix enlisted the help of CPA James LaManna in preparing his delinquent returns. LaManna testified that Dr. Adix gave him Pinnacle's financial records, but LaManna didn't believe he'd

---

[3] Dr. Adix testified that she was "the only shareholder" of ICORP, though.

seen any Forms 1099 for Pinnacle.  When Dr. Adix filed his belated returns, he reported the income he earned through Pinnacle—but none of the income that hospitals paid him as compensation for his medical services that went through ICC and ICORP.  The upshot of this was that, for the period from 2012 through 2015, Dr. Adix reported a total of $325,000 in income.  Yet that period also showed he spent over $1.1 million on various personal expenses, including payments to family, trips to casinos and amusement parks, and credit-card payments.

Besides failing to report his income from ICC and ICORP, Dr. Adix also listed his then-twenty-year-old stepdaughter, Lacey Stackton, as a dependent without her knowledge.  Stackton's name appeared on signature cards for two of ICORP's bank accounts, which she used to sign checks for family-related expenses and cash.  One of these signature cards also listed Corinne's title as "[o]ther" and listed her as an "[a]uthorized [a]gent" permitted to sign checks for ICORP, too.[4]  Stackton testified that Corinne told her she could sign the ICORP checks while Corinne and Dr. Adix were out of town.  She said she may have written these checks at Corinne's direction.  Besides Stackton's signature, some of the ICORP checks— including one depositing funds from one of the hospital staffing agencies—contained Corinne's signature.

Dr. Adix ultimately submitted his tax returns for 2012–14 in September 2015, and he filed his returns for the 2015 tax year in

---

[4] A signature card for ICC showed Dr. Adix's friend and business associate as ICC's "president," but it didn't include Corinne's name.

2016.  Corinne hadn't filed her own returns for that period, and LaManna said Dr. Adix told him that Corinne would file her own returns.  In fact, though, neither ICC, ICORP, nor Corinne filed *any* tax returns during the calendar years 2012 to 2016.  And neither ICC nor ICORP reported any money paid to Pinnacle for the 2012–15 tax years.  In total, Dr. Adix underreported about $1.2 million in income over that time.

### C.  Dr. Adix's Good-Faith Defense

Dr. Adix's defense at trial was that ICC and ICORP were Corinne's corporations, so their income was Corinne's (and not his) personal income.  Based on this position, Dr. Adix mounted a "good-faith defense," arguing that he didn't willfully or intentionally fail to adequately report his personal income on his Forms 1040 for the 2012 to 2015 period.

In support of this defense, Dr. Adix asserted that Corinne owned and operated ICC and ICORP on her own.  He testified that he did not intentionally fail to report the income he made because he believed the information he'd provided in his tax returns was accurate.  According to Dr. Adix, he shared with his attorney Pinnacle's 2012 agreement with ICC, and a 2013 agreement between Pinnacle and ICORP.  Dr. Adix also said he showed Pinnacle's bank statements to CPA LaManna.  And he claimed he didn't have access to the bank statements and financial information for ICC—only Corinne did.  But, he said he gave LaManna his bank-account information, which he said contained "in" them the amount of money he received from ICC.

LaManna, for his part, testified that Dr. Adix gave him financial information to prepare the taxes; and when asked "[f]or what entity," LaManna replied "Pinnacle . . . ." But LaManna wasn't expressly asked whether, in preparing Dr. Adix's taxes, he received any of ICC's or ICORP's own financial records from Dr. Adix.

Based on this evidence, Dr. Adix testified that he "believe[d]" all the information in his tax returns was accurate, in part because he "assume[d] that [his] CPA d[id] a good job." But Dr. Adix didn't look to see whether he was getting paid what he was supposed to be paid under the contracts—he "just assumed that [he] was getting paid [what Pinnacle should be getting paid] based upon the contract."

So to sum up, Dr. Adix's defense was that he believed the money, which hospitals paid ICC and ICORP as compensation for medical services he provided, was Corinne's personal income and not his own, just because it went through those two corporations. Based upon this claimed belief, he argued that his failure to adequately report his personal income taxes for the 2012–15 period was non-willful and in good faith.

### D. *The Excluded Evidence*

This appeal concerns the district court's decision to exclude evidence about Corinne's 2018 filings of ICC's and ICORP's corporate tax returns.

Defense counsel sought to introduce this evidence twice at trial. The first time the issue arose was just after the government had asked IRS investigator Thomas Bolus whether he knew if

Corinne, ICC, or ICORP filed tax returns for the period from 2012 through 2016. Bolus responded that none of them had filed any tax returns for that period. So defense counsel sought to cross-examine Bolus about whether Corinne filed tax returns for herself, ICC, and ICORP after 2016.

At sidebar, defense counsel explained his reasons for wanting to ask Bolus about the post-2016 period as follows: "I think it is relevant as it goes to [Dr. Adix's] state of mind when he's submitting his returns as to what he believes [Corinne] is doing as to those corporations and herself." He added that it would also be relevant for cross-examining CPA LaManna, who provided tax-preparation services for Dr. Adix in 2016 and "for Corinne Adix and her corporation since 2018." Besides showing Dr. Adix's state of mind, defense counsel said that he wanted to introduce this evidence because it was "relevant for purposes of impeach[ing]" LaManna. Counsel explained that LaManna had said he "would have fired [Dr. Adix] as a client," had he known about the conduct Dr. Adix was charged with. But "shortly thereafter [LaManna was] filing returns" on behalf of Corinne.

After an extended colloquy with counsel, the court decided to exclude the evidence. Upon considering counsel's relevance proffer, the court said that evidence that Corinne had filed 2018 tax returns for ICC and ICORP "wouldn't be relevant to [Dr. Adix's] state of mind in 2016 . . . ." Defense counsel then suggested that it would show "what [Dr. Adix] believe[d] that his spouse was doing as the owner and operator of" ICC and ICORP. The court

confirmed, "So you are offering it as something filed in 2018 as something probative of one's state of mind in 2016?" Defense counsel responded, "At this point I'm not offering it. What I'm asking is to be able to cross-examine [Bolus] about whether or not he looked" at whether Corinne filed any tax returns "from 2016 up until the date that [Bolus] pulled all these records."

Next, the court heard from the government. The prosecutor told the court about an alleged meeting in October of 2018 between attorneys for Dr. Adix and Corinne and IRS agents. At the meeting, according to the prosecutor, the parties talked about how nothing had been filed for ICC or ICORP; and "it was discussed . . . that Corinne Adix was going to take care of that," so the returns were then filed in December 2018, "more than three years after the defendant had filed his 2012 through 2014 [Forms] 1040[]" in 2015, "and a little more than two and a half years after he had filed his 2015 returns," in 2016.

The government then explained its position that any evidence regarding Corinne's 2018 filings would be inadmissible as hearsay. It pointed to Rule 803(3), on the state-of-mind hearsay exception, which does not authorize any "statement[s] of memory or belief [used] to prove the fact remembered or believed . . . ." Fed. R. Evid. 803(3). But this was precisely what defense counsel said he wanted to use the evidence for here.

So the district court did not permit the evidence to come in at that time. It sustained the objection on hearsay grounds, explaining that the evidence could not be "offered for the state of mind,

what happened in 2018." The court continued, "It's also at this point not relevant," as it is "not relevant as to what was in one's state of mind in . . . 2016."

Later in the trial, defense counsel again tried to admit evidence of Corinne's 2018 corporate tax filings. Now with Dr. Adix on the stand, defense counsel argued that the door had been "opened" for him to ask Dr. Adix "about his knowledge about his wife obtaining services of the same CPA who did his taxes to prepare the taxes for [ICORP] and ICC."[5] The court confirmed that defense counsel wasn't trying to ask specifically about the October 2018 meeting involving the IRS and the Adixes' counsel. The government objected. The court ruled that "we are not going to get into that because that happened after the fact, after [Dr. Adix] was notified" that the IRS's Criminal Investigation Division ("CID") was investigating Dr. Adix—and because it happened after the October 2018 meeting, which the court understood was "preparatory to the CID report typically going up to the [Department of Justice] [T]ax [D]ivision."

### E. Closing Arguments and the Jury's Verdict

In its closing, the government argued that the roughly $1.2 million in unreported income was Dr. Adix's, and not Corinne's.

---

[5] The defense sought to admit evidence only that Corinne had filed tax returns in 2018 on behalf of ICC and ICORP, not the contents of those tax returns. And at no point did Dr. Adix seek to proffer the contents of the tax returns, so we don't know how much, if any, the returns reported of the monies those companies received from Dr. Adix's salary payments.

The prosecutor asserted that there was "zero evidence to support" defense counsel's opening statement, which had suggested that ICC and ICORP were Corinne's companies, and that Dr. Adix thought she'd file "for" them.

In Dr. Adix's closing, defense counsel blamed Corinne for the tax-reporting discrepancies. He argued that Dr. Adix was "not paying attention to what his wife . . . was doing[.]" And he said that Corinne created ICC and ICORP for herself "to maybe make some more money . . . ." Defense counsel pointed to ICORP's banking records and the stepdaughter's testimony as "the most compelling evidence" of Corinne's involvement in the two corporations. In sum, counsel argued the good-faith defense that Dr. Adix was "trying to do the right thing" and "to comply" with the law, "but he didn't know" what Corinne was up to, so "[h]e was blindsided."

The jury rejected Dr. Adix's defense. It adjudicated Dr. Adix guilty of four counts of tax perjury in violation of 26 U.S.C. § 7206(1),[6] for underreporting his income on his Form 1040 personal tax returns for the years 2012, 2013, 2014, and 2015. The court then sentenced Dr. Adix to thirty-three months of imprisonment and one year of supervised release.

---

[6] 26 U.S.C. § 7206 criminalizes the "[w]illful[] mak[ing] and subscrib[ing of] any return, statement, or other document, which contains or is verified by a written declaration that it is made under the penalties of perjury, and which [one] does not believe to be true and correct as to every material matter . . . ."

### F.  Posttrial Proceedings

Dr. Adix moved for a new trial, arguing that the district court erred in excluding the evidence about Corinne's alleged 2018 filings of ICC's and ICORP's corporate tax returns.  He contended that this evidence would've further supported his good-faith defense—in short, by "corroborating" Dr. Adix's belief that Corinne would file the returns for ICC and ICORP, and that ICC's and ICORP's income was Corinne's own income (as ICC and ICORP's owner) and not his personal income.

The district court denied this motion.  In so doing, it said simply that "the Government's response [to the motion] has the better and more apt view of the record and law," and that the court additionally did "not believe that the defense proffer of the offered but excluded evidence was sufficient to fully advise the Court of this evidence or its intended importance during trial."

On appeal, Dr. Adix argues, first, that the district court erred at trial in excluding the evidence about Corinne's 2018 filings of ICC's and ICORP's corporate tax returns.  He contends that excluding this evidence on relevance and hearsay grounds, as the district court did, was reversible error.  Second, he argues that the district court relatedly erred in denying his motion for a new trial, which was premised on the same evidentiary exclusion.

For the reasons that follow, we affirm the judgment of the district court.  Assuming without deciding that the district court abused its discretion in excluding this evidence, any error was

harmless. And the district court did not abuse its discretion in denying the motion for a new trial.

## II.    DISCUSSION

The parties dispute whether Dr. Adix properly preserved his objections to the district court's evidentiary rulings. As we've noted, *see supra* at n.2, this matters because we apply an abuse-of-discretion standard to preserved objections to those rulings. *United States v. Graham*, 981 F.3d 1254, 1260 (11th Cir. 2020). But we review only for plain error if a party fails to object at trial. *Id.* Here, we assume without deciding, first, that the standard of review for the evidentiary rulings is abuse of discretion, and second, that the district court abused its discretion. We need not decide these issues because any error here was harmless.

We review the district court's denial of the new-trial motion for abuse of discretion. *Chmielewski v. City of St. Pete Beach*, 890 F.3d 942, 951 (11th Cir. 2018).

We first discuss the evidentiary exclusion, and then move on to the motion for a new trial.

### A.    *Even if there was error, any error was harmless.*

Even if the exclusion of evidence that Corinne filed 2018 corporate tax returns was erroneous, it was harmless on this record.

Generally, we will not reverse a defendant's conviction "if the error 'had no substantial influence on the outcome and sufficient evidence uninfected by error supports the verdict.'" *See*

*United States v. Hands*, 184 F.3d 1322, 1329 (11th Cir.), *corrected*, 194 F.3d 1186 (11th Cir. 1999) (citation omitted); *see also* Fed. R. App. P. 61.

The evidence against Dr. Adix was abundant, and he failed to show that the exclusion of this tidbit prejudiced his substantial rights. *See Hands*, 184 F.3d at 1329. No matter who he thought would report ICC's or ICORP's corporate income, Dr. Adix still had a duty to report his own personal income for the 2012–15 tax years. He failed to do so. He didn't file any personal tax returns for years, until the IRS brought it to his attention.

And when he did eventually file, he didn't disclose all his income. He disclosed to the CPA only the income he earned through Pinnacle (not through ICC or ICORP), despite his repeated testimony that he understood ICC and ICORP to have been created to receive the compensation for his own emergency-room work and despite evidence that he used significant amounts of this money on personal expenses. He also falsely claimed his twenty-year-old stepdaughter as a dependent. And no one, including Dr. Adix, filed tax returns for ICC or ICORP for the period in question. Nor did Dr. Adix himself directly testify that he believed Corinne would have done so.

Plus, even if Dr. Adix thought Corinne would file returns for ICC and ICORP, so what? The trial wasn't about ICC's or ICORP's failure to file corporate taxes. It was about Dr. Adix's failure to report his personal income. And it was well established that Dr. Adix understood ICC and ICORP—just like Pinnacle—to have been

created for the express purpose of processing the income he earned as an emergency-room physician. Indeed, he himself entered contracts on behalf of ICC and ICORP, holding himself out as their representative. Not only that, but Dr. Adix was the one who did the work on all these contracts. Even defense counsel acknowledged as much at the trial when he stated that the money "going through" ICC and ICORP "has nothing to do with Dr. Adix other than he is the one that's doing the work."

The government at trial also established that Dr. Adix spent nearly the same amount of money that he failed to report in his taxes on personal expenditures, far in excess of his $325,000 in reported income during that same period. This included $311,725.90 for the period in question on cash and checks. The money was spent on casinos ($37,150.72), retail stores ($127,331.05), and amusement parks ($9,983.21), as well as hotels, salons, and massages. Another $195,414.64 was spent on credit-card payments. Some was spent on direct payments to the Adixes' family members. In all, Dr. Adix's bank accounts showed over $1.1 million of expenditures during this period.

On this record, we don't see how the evidence about Corrine's 2018 filings two-and-a-half years after Dr. Adix's offense would've moved the needle for the jury. Dr. Adix was required to report the income he received through ICC and ICORP, just as he was required to report his payment for compensation funneled through Pinnacle. He didn't. Instead, he spent that money on personal expenditures.

Plus, Dr. Adix testified in his own defense at the trial. The jury clearly didn't believe him. *United States v. Brown*, 53 F.3d 312, 314 (11th Cir. 1995) ("[W]hen a defendant chooses to testify, he runs the risk that if disbelieved the jury might conclude the opposite of his testimony is true." (citation and internal quotation marks omitted)). Here, as we've reviewed, Dr. Adix presented a lot of evidence in his defense: he testified that Corinne owned and operated the corporations, that he had no role in incorporating them, and that he didn't know much about how they functioned. He said that Corinne's income consisted of the balance of the payments ICC and ICORP received, minus the expenses required "to accomplish [his] job." He testified that he told CPA LaManna about Pinnacle's arrangements with ICC and ICORP; and that Pinnacle's 2012–15 tax returns were accurate, in his view, based on the information he provided to the CPA, and because he trusted the CPA's work.

The 2018-filings evidence was far from critical to this defense—the core "substance" of which Dr. Adix did fully present, despite the evidence's exclusion. So any error here was harmless. *See United States v. Wellendorf*, 574 F.2d 1289, 1290 (5th Cir. 1978) (finding harmless error where a defendant testified in furtherance of his good-faith defense, notwithstanding the trial court's exclusion of some evidence that would've further supported it).[7]

---

[7] Fifth Circuit decisions issued before the close of business on September 30, 1981, are binding on the Eleventh Circuit. *Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir. 1981) (en banc).

Dr. Adix's arguments to the contrary are unconvincing.

He argues that the exclusion of this evidence was not harm-less because it "related directly to the determinative issue of Dr. Adix's intent," and because the government argued, at closing, "that the very lack of this excluded evidence was persuasive evi-dence of Dr. Adix's guilt." In support, he cites *United States v. Todd*, 108 F.3d 1329 (11th Cir. 1997). There, we said that "where 'the ex-cluded testimony related to the determinative issue of intent, we cannot say that the error was harmless.'" *Id.* at 1334 (quoting *United States v. Gaskell*, 985 F.2d 1056, 1063 (11th Cir. 1993)). In Dr. Adix's view, the excluded testimony "would have corroborated and made credible Dr. Adix's testimony that Corinne Adix, not h[e], was responsible for reporting" the income from these corporations as her own. And he points to the government's comments at clos-ing that "there is zero evidence to support" defense counsel's open-ing statement that ICC and ICORP were Corinne's companies, and so Dr. Adix thought she'd file their tax returns.

First, Dr. Adix's intent argument fails. It's true, as Dr. Adix points out, that generally, "where the element of willfulness is crit-ical to the defense, the defendant is entitled to wide latitude in the introduction of evidence tending to show lack of intent." *United States v. Garber*, 607 F.2d 92, 99 (5th Cir. 1979) (en banc). But we've also said that when a defendant "was able to place" the "*substance*" of his good-faith defense to the jury, "the fact that the defense was not elicited in the precise manner originally contemplated by the

defendant is not a proper basis for reversal." *Wellendorf*, 574 F.2d at 1290 (emphasis added).[8]

In addition, we've never suggested that district courts must admit all evidence undergirding a good-faith defense in a tax-evasion case. *See, e.g.*, *United States v. Fingado*, 934 F.2d 1163, 1165 n.1 (10th Cir. 1991) (observing that "*Cheek* [*v. United States*, 498 U.S. 192 (1991)] did not require the admission of any and all evidence showing a basis for the defendant's beliefs"). For instance, in *Wellendorf*, our predecessor Court declined to reverse the defendant's conviction, on an evidentiary-exclusion claim, because it found that the defendant was still able to put on the "substance" of his good-faith defense through other evidence. 574 F.2d at 1290. So too here.

Relatedly, Dr. Adix argues that the excluded evidence was significant to corroborating his good-faith defense, citing *United States v. Hurn*, 368 F.3d 1359, 1363 (11th Cir. 2004). But this is not a case, like *Hurn*, where the excluded evidence would have placed the story told at trial "in a significantly different light." *See id.* Rather, Dr. Adix already argued that he thought Corinne owned these corporations and, in turn, was responsible for reporting the income they earned. At trial, he testified that Corinne owned and operated them. An IRS officer testified that if Corinne owned ICC and

---

[8] And of course, Dr. Adix's trial counsel could have simply asked Dr. Adix directly why he didn't report the ICC and ICORP income on his taxes. He then could have replied that he thought Corinne would be filing these taxes. Indeed, the prosecutor expressly offered this at sidebar. But Dr. Adix didn't testify to that effect.

ICORP, then she would've been obligated to file their taxes. And defense counsel argued that his client was "blindsided" by a lack of awareness of what Corinne was doing with the payments made to ICC and ICORP. Though the excluded evidence would be one more piece of evidence in line with this defense, the 2018-filings evidence isn't critical to the story. In other words, Dr. Adix was still "able to place" the "substance" of his good-faith defense to the jury. *Wellendorf*, 574 F.2d at 1290.

Second, Dr. Adix's argument about the government's closing doesn't help him, either. Dr. Adix blamed his failure to report his taxes on Corinne, ICC, and ICORP. So the government was "entitled to make a fair response." *See United States v. Hiett*, 581 F.2d 1199, 1204 (5th Cir. 1978). Though it may have been hyperbole to say there was "zero evidence to support" the idea that Corinne owned ICORP and ICC, we've already explained why the evidence that Corinne filed ICC's and ICORP's 2018 tax returns wouldn't have done much to show that, in 2015, when Dr. Adix failed to disclose or pay taxes on the income he drew from ICC and ICORP, he thought Corinne was paying taxes on that money. Not only that, but the trial court charged the jury not to take counsel's statements or arguments as evidence. And we presume juries follow the court's instructions. *United States v. Almanzar*, 634 F.3d 1214, 1222 (11th Cir. 2011).

At bottom, Dr. Adix hasn't carried his burden of showing that there was any reasonable probability that the verdict would've been different had this evidence been admitted. *See Hands*, 184 F.3d

at 1329. So even assuming its exclusion was erroneous, any error was harmless.

### B. *The district court did not abuse its discretion in denying Dr. Adix's motion for a new trial.*

Nor did the district court abuse its discretion in denying Dr. Adix's motion for a new trial, which was based on the same issue.

The Federal Rules of Criminal Procedure provide that "the court may . . . grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33. Generally, the district court's ruling on a new-trial motion is within its "sound discretion," and so it "will not be overturned on appeal unless the ruling is so clearly erroneous as to constitute an abuse of discretion." *United States v. Wilson*, 894 F.2d 1245, 1252 (11th Cir. 1990), *cert. denied*, 497 U.S. 1029 (1990) (citation and internal quotation marks omitted).

There was no abuse of discretion here in denying the motion for a new trial. Even if the court abused its discretion in its underlying evidentiary rulings, Dr. Adix failed to carry his burden of showing substantial prejudice.

In sum, Dr. Adix hasn't shown the prejudice required to mandate a new trial. So the district court didn't abuse its discretion in denying his motion for one.

### III.    CONCLUSION

We conclude that even if the district court did err in excluding the evidence of Corinne Adix's 2018 filings on behalf of ICC and ICORP, any error was harmless. So we affirm the district court's

23-11548                Opinion of the Court                21

evidentiary ruling and its related denial of Dr. Adix's motion for a new trial.

**AFFIRMED.**